IN RE INTEREST OF L.J. AND J.J., CHILDREN UNDER 18 YEARS OF AGE.
IN RE INTEREST OF J.N.J., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. G.J.A., APPELLANT.

368 N.W.2d 474

Filed May 31, 1985.   Nos. 84-517, 84-518.

John P. Heitz, for appellant.

Teresa M. Hampton, for appellee.

Tad D. Eickman, guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

These consolidated cases are before us on appeal from the district court for Brown County, Nebraska, which affirmed the order of the county court for Brown County, sitting as a juvenile court (hereinafter juvenile court), terminating the parental rights of G.J.A., formerly G.J., as to her three children: L.J., born November 24, 1976; J.J., born July 13, 1978; and J.N.J., born September 6, 1979. The two older children were born to G. and her husband after their marriage

in 1976, when G. was 17 years old, and the youngest child was born to G. out of wedlock after her divorce from her husband. The fathers of the children have not appealed and will not be considered further herein. Having reviewed the record, we reverse and remand with directions.

The cases were initiated by petitions filed in the county court on October 22, 1979. One petition alleged that the two older children were neglected and dependent children as defined in Neb. Rev. Stat. § 43-202(2)(b) and (c) (Reissue 1978), now replaced by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984), and the other that the youngest child was also so neglected and dependent. The petitions alleged that the children were in the custody of the Brown County Welfare Department. On November 1, 1979, a "Stipulation & Agreement" was signed in each case by G. and the county attorney. The "agreements" provided that the children would be returned immediately to G. and that the cases would be continued for 6 months "unless a substantiated incident of child abuse or neglect is received by any law enforcement official in Brown County, at which time the case will be subject to review." The agreements also provided that G. was to provide a proper home and was to seek educational courses in child care and housekeeping. The record shows no involvement of the court at any time in these proceedings.

On February 11, 1980, the three children were placed in foster care after J.N.J. was left with a babysitter for 10 days. The infant had been left pursuant to an agreement between G. and the babysitter and was to have been picked up in 2 or 3 days, but G. failed to do so. G. testified that she had returned to Ainsworth and picked up the two older children, who had been left with a different babysitter pursuant to a similar understanding. G. testified that J.N.J.'s babysitter wanted to keep him longer and G. agreed. The babysitter, with J.N.J., went to the welfare authorities, and J.N.J. and the other two children were taken into the custody of the Department of Public Welfare. An adjudication hearing, as to J.N.J. only, was held on March 12 and 14, 1980. At this hearing a guardian ad litem was appointed for J.N.J. only. Evidence was adduced which showed that the mother on four occasions left J.N.J. and

the older children with babysitters overnight while she went to Valentine, Nebraska, 45 miles away, for work or for social occasions. On another occasion the children were left alone in a car, warmly dressed and covered with blankets, for 2 hours while the mother and a female friend were in a tavern. The mother and friend checked the children periodically. In another instance, the younger children were left alone at home while the mother and L.J. were at G.'s mother's house returning a vacuum cleaner. The fourth incident involved G.'s leaving the children with an 11-year-old girl and a 12-year-old girl until 2:30 a.m.

One of the babysitters testified that J.N.J. had diaper rash severe enough to cause blistering and bleeding. There was no evidence of any type of physical or mental abuse of the children, either by G. or any other person.

That hearing did not go to conclusion. The State had been adducing evidence when the parties agreed to a "Stipulation and Agreement," again between G. and the county attorney, by which G. temporarily relinquished custody of the three children to the Brown County Court. She also agreed to work with the Department of Public Welfare to aid in an investigation of herself, to provide a stable home for the children, to refrain from alcohol use, and to seek treatment at the Norfolk Regional Center. The agreement also provided that:

3. It is understood and agreed between the parties hereto that [G.] shall not come back into Court nor attempt to petition the Court for restoration of her parental rights for at least six months from the date of this agreement.

4. It is further agreed between the parties hereto that before [G.] shall petition the Court for restoration of her parental rights that the burden of proof shall be upon her to substantiate satisfactorily to the Court that she is a fit and proper person to have the care and custody of said children; that her social life, financial ability, housekeeping skills and child rearing skills are adequate and that she had developed mentally to show proper regard for the health, safety, moral, physical and emotional well being of said children.

The record shows G.'s relinquishments were temporary and that the hearing was recessed by the court without making any findings as to neglect, and the court specifically continued the case as an adjudication hearing. The court order adjourning the hearing stated that "a Stipulation and Agreement would be entered into between the parties setting forth the rights of [G.] in regard to petitioning the Court for restoration of her parental rights." The agreement was not incorporated into a court order, nor does the record show any participation of the court. The children were separated (the older two in one home and the youngest in another) and have remained in foster care, in different homes and locations, from March 14, 1980, to this date.

On June 17, 1981, a third amended petition was filed in each case seeking termination of G.'s parental rights. No court adjudication as to the status of any of the children had been held at this point, nor was one prayed for in the amended petitions. No hearing of any kind had been held as to the older two children, except that they had been mentioned in J.N.J.'s hearing.

A hearing on this petition was held on February 3, 1982. At this hearing the two cases were consolidated. A different guardian ad litem represented the three children. No explanation is found in the record for the delays in holding hearings on the adjudication phase of the case from the mother's voluntary relinquishment in March of 1980 until February of 1982; no explanation as to the timelag from the petition seeking termination to the hearing date; and no explanation of the combining of the adjudication portion of the hearings with the disposition of the case, when Neb. Rev. Stat. § 43-206.03 (Reissue 1978) established a procedure for adjudication and then disposition.

At the February 1982 hearing, the transcript of the March 1980 hearing was introduced as evidence. Much of the evidence at the February hearing centered around G.'s financial situation and whether she and her new husband could support a family with three young children on his income as a roofer and a fire-extinguisher refiller. Additional testimony concerned her unstable employment history (8 to 10 jobs in 2 years) and

transient lifestyle (5 homes in 2 years). There was also evidence adduced concerning bad checks she had written and had been placed on probation for writing. A social worker testified about her failure to complete a parenting course, although G. had taken about 10 classes. There was no further evidence of the activities of G. toward her children, although there was evidence as to the children's interaction with their foster parents. At this time J.N.J. was in a home in Ainsworth and the two older children were in a home in Oakland, Nebraska, having been removed from a home in Ainsworth about 1 year before the hearing.

Upon completion of the hearing the judge took the matter under advisement. On May 19, 1982, the court issued its order terminating the parental rights of G. "effective December 31, 1982, unless, before that date [G.] has satisfactorily improved her behavior, activities and lifestyle sufficient to conform to the plan of rehabilitation prepared by the State Department of Public Welfare of the State of Nebraska." The court's order went on,

> It is further ordered that if the Department of Welfare declines to proceed with a plan for rehabilitation before June 30, 1982, that the Court will, after notice and hearing, set up guidelines and requirements for [G.'s] rehabilitation and possible restoration of parental rights.
>
> This cause stand [sic] continued until January 5, 1983, at 10:00 a.m.

Apparently pursuant to the order of May 19, 1982, a plan for G. and her husband and for the children was prepared by the Nebraska Department of Public Welfare. The plan was developed by G.'s caseworker in Grand Island in consultation with the caseworker's supervisor in Grand Island, a caseworker supervisor in the Norfolk field office, another caseworker, the director of Multi-County Service Unit No. 144, and a service worker in Multi-County Service Unit No. 142. The plan required G. and her husband to receive marital counseling, to complete a parenting course, to report changes of address and changes in legal, health, family, and employment status to the caseworker, and to acquire and reside in a three-bedroom house or apartment. G. was also required to undergo psychotherapy,

to satisfy all county court orders regarding her bad check cases, to attend Al-Anon meetings, and to pay to the department $50 per month child support for each child "as a token of good faith." Her husband was to maintain his sobriety and maintain steady employment. Visitation with the children was to be for 1 hour once a month, beginning in July, until October, when the visitations would be increased to twice a month. In November and December multiple day visitations would be allowed. The record shows no court input into this plan, no court review of the plan, and no court order putting it into effect.

A hearing was held on December 23, 1982, and on January 5, 1983. At this hearing evidence was adduced concerning G.'s compliance with the plan. Evidence showed she had not complied fully with the visitation plan nor with the required child support payments, and had not fully complied with other requirements. She was living in a properly furnished, appropriate three-bedroom rented home. Other testimony centered around G.'s financial situation and whether it was sufficient to raise her children. At the conclusion of the hearing, the court found that G. "has not complied with the terms of the Court Order of February 3, 1982 and that [G.] has not complied with the plan devised by the Department of Public Welfare and her parental rights are terminated." On appeal the district court reviewed de novo on the record and affirmed. This appeal followed.

In appeals from the termination of parental rights in a county court sitting as a juvenile court, the Supreme Court reviews such cases de novo on the record. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984). An order terminating parental rights must be based upon clear and convincing evidence and should only be issued as a last resort and when no reasonable alternative exists. *In re Interest of M.*, 215 Neb. 383, 338 N.W.2d 764 (1983).

G. argues that the proof offered did not rise to the level of "clear and convincing." We agree. Neb. Rev. Stat. § 43-292(2) (Reissue 1984), which was in effect when the parental rights were terminated, requires that the parents must have "substantially and continuously or repeatedly neglected the juvenile."

While the seriousness of the three instances of G.'s leaving the children with babysitters overnight, or leaving two of the children unattended while she was at her mother's house in the daytime, and leaving the youngest child with a babysitter for an extended period of time should not be diminished, such instances over a relatively short period of time do not reach the pattern of neglect contemplated by the statute.

The juvenile court's findings must be considered in two phases. After the February 3, 1982, hearing, the juvenile court, in its order of May 19, 1982, found that "the parents of [J.J., L.J., and J.N.J.] have substantially and continuously or repeatedly neglected the children and have refused to give the children the necessary care and protection," and terminated G.'s parental rights effective December 31, 1982. This finding is substantially in the words of Neb. Rev. Stat. § 43-209 (Reissue 1978), which was then in effect.

The second phase of the juvenile court's findings was made by the juvenile court in its order of January 12, 1983, after additional hearings on December 23, 1982, and January 5, 1983. This phase of the findings was concerned only with G.'s conduct between February 3 and December 31, 1982. At this time § 43-292 had become effective, as of July 1, 1982. Former statute § 43-209 and the current statute § 43-292 contain substantially the same, and in many cases identical, language, and only the current statute need be considered.

In reviewing these matters de novo on the record, more than 5 years after the incidents which are the basis for all of the court's later actions, a reviewing court must give great weight to the findings of the juvenile court in all cases where there is a dispute in the evidence, " 'because the trial court heard and observed the parties and witnesses . . . .' " *In re Interest of Hollenbeck*, 212 Neb. 253, 262, 322 N.W.2d 635, 640 (1982). In our review we cannot agree with the findings of the juvenile court in respects that controlled that court's decisions, and we therefore have difficulty in determining disputed fact questions. The juvenile court found in its May 19, 1982, order that "for several years prior to the removal of her children by this Court on February 27, 1980," G. had engaged in a pattern of neglect of her children. The "several years" indicated by the

juvenile court could have extended, at the extreme, to 3 years and 3 months—the age of the oldest child. The only evidence before the court was that of incidents between October 2, 1979, and approximately February 1, 1980—a period of 4 months, not several years. The juvenile court also found that J.N.J., according to a foster mother's testimony, " 'didn't do nothing for the first 10 months' " and " 'has only recently began to show progress.' " We find that for the last 5 of the 10 months referred to, J.N.J. had been in foster care, and it is not proper to imply blame to G. for his condition during that time. The juvenile court also found that "[J.J. and L.J.] were described by their foster parents as having lost their previously manifested intense fear of being left alone and have begun to progress normally." We find the facts to be that the foster parents who so testified are indeed decent people, but they received the two older children into their home on February 24, 1981. At that time the children had just been removed from a foster home selected and supervised by the State and where the children had been placed since March 14, 1980, until early February of 1981. Whether the condition of the children in February of 1981 can partly be blamed on G. (for so conducting herself as to require the initiation of these proceedings) cannot be determined from this record. We do know, however, that in the year immediately preceding the intervention of the foster parents referred to, in February of 1981, the condition of the children was the sole responsibility of the State, which had sole custody of the children between March of 1980 and February of 1981.

We find that in her actions toward her children between October 2, 1979, and February 1, 1980, G. did not "substantially and continuously or repeatedly" neglect her children in such a fashion as to require termination of her parental rights.

That determination, however, does not dispose of this case. Section 43-292, in part, provides for termination of all parental rights if it appears "by the evidence that one or more of the following conditions exist." Six "conditions" are then listed. Subsection (6) provides that termination may be ordered if, "[f]ollowing a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable

efforts, under the direction of the court, have failed to correct the conditions leading to the determination." Applying this section of the statute, the court determined in its January 12, 1983, order that G. had not corrected the problems.

In this connection the juvenile court found that G. had not rehabilitated herself, first in the time between March 14, 1980, and February 3, 1982, and then during the period between May 19, 1982, and January 5, 1983. This finding was used by the juvenile court in its final order terminating G.'s parental rights on January 12, 1983, and this finding is challenged in G.'s assignments of error.

The question of whether G. has rehabilitated herself is central to this case as it is presented. We have held that there "is no requirement that the court must implement a rehabilitation plan for the parent of a child found to be dependent and neglected." *In re Interest of Carlson*, 207 Neb. 540, 543, 299 N.W.2d 760, 762 (1980); *In re Interest of Hollenbeck*, 212 Neb. 253, 322 N.W.2d 635 (1982). We have also held that failure to comply with a plan of rehabilitation is an independent reason justifying termination of parental rights if the court in its discretion had ordered the parent to make reasonable efforts to rehabilitate. *In re Interest of Wood and Linden*, 209 Neb. 18, 306 N.W.2d 151 (1981).

While there is no requirement that a juvenile court must institute a plan for rehabilitation of a parent, where the failure of a parent to comply with a rehabilitation plan is an independent ground for termination of parental rights, the rehabilitation plan must be reasonable and conducted under the direction of the juvenile court. We are required by considerations of due process to follow the directives of § 43-292(6), set out above, referring to "reasonable efforts, under the direction of the court," seeking to correct any substandard conditions.

In this case the State's plan, with which the court found G. did not comply, is deficient in two respects. First, the plan was not reasonable. It is apparent that, from the start, G. would not be able to comply with the plan, not necessarily because she was unfit, but because she was poor and because she was located at such a great distance from the children. We have said that a

parent's rights may not be terminated because the parent has financial difficulties or because some other person may be able to better provide for the children. *In re Interest of D.*, 209 Neb. 529, 308 N.W.2d 729 (1981). This must be borne in mind when formulating a plan. Here, in testimony at the December 23, 1982, and January 5, 1983, hearings, it was undisputed that G. objected to paying a total of $150 per month to the welfare department as child support because she did not have any extra money. G.'s husband had a take-home pay of $600 to $700 per month. Their groceries, utilities, and rent amounted to approximately $400 to $450 per month. Out of the surplus, the plan required G. to pay $150 child support "as a token of good faith." To someone on a budget this limited, $150 seems to be a bit more than a token. Additionally, G. was to undergo psychotherapy. She testified that she was unable to comply with that part of the plan because the mental health center told her that she could not receive therapy until she paid a bill of $78 she already owed there. At the time, G. was indebted for more than $5,000 in hospital bills.

G. rightly objected to the caseworker concerning the child support payments. Her objections were that she could raise her children in her own home for less and that she just could not afford that amount. The caseworker made no adjustment in the amount. The caseworker testified that "I simply told her that it was a part of the plan and that I felt it was a necessary part to show that they were going to be financially able to take care of children. . . . She said she could not. That was about the size of it." The caseworker was aware that G.'s lack of funds caused some cancellation of visitation and trouble with counseling and rent. Those facts were specific reasons for the welfare agency's recommendations that G.'s parental rights be terminated.

With regard to visitation the plan required G. to visit L.J. and J.J. at the welfare office in Norfolk, Nebraska, on July 17, 1982, from 11 a.m. until 12 noon, and once monthly thereafter. L.J. and J.J. were living in Oakland, Nebraska, at this time. She was to visit J.N.J. on the same day, in Ainsworth, from 4 p.m. until 5 p.m. We note that Norfolk and Ainsworth are 150 miles apart, while Oakland is an additional 75 miles east of Norfolk. Such a visitation plan can only be considered as

designed for failure—if for nothing other than the distances involved.

At the December 1982 hearing, G. testified, on the State's cross-examination, that she was unable to visit the children in September 1982 because she had just gotten out of the hospital. G. testified that she had colitis, which had the effect of making her "very ill. Violently ill. Throwing up. Having diarrhea. Throwing up blood." G. testified that seeing her children for such a short time and so infrequently caused her such stress that the doctor recommended she not attempt to see the children, under the circumstances. She presented a report from her doctor which apparently stated she should not travel. This medical report was received in evidence by the court but is not in the record for our review, and neither its reception nor location are set out in the index to the bill of exceptions. (Missing from the record also is a document which G. offered, and the court received in evidence, showing that she had completed a parenting class.) In connection with her physical condition, G. testified she could not bear any more children.

Aside from the unreasonableness of the plan, the other flaw is that it was not put into effect under the direction of the juvenile court. It was drawn up by the welfare authorities after the court had ordered rehabilitation and was not the subject of any court order or any court review. In transferring its authority, in blank, to the faceless forces comprising a state agency, the juvenile court abdicated its jurisdiction. Such a transfer of jurisdiction is totally improper. In the situation presented in this case, this is not sufficient proper evidence to justify termination of G.'s parental rights.

Since the causes must be remanded for further proceedings, we are forced to note the deficiencies in the procedures afforded G. and her children in order that such procedures are not repeated. The general rights of both G. and her children, with regard to the termination of her parental rights, have been discussed. The U.S. Supreme Court recently held in *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982):

> In *Lassiter* [*Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981)], it

was "not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." . . . The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. [Citations omitted.]

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

Initially, we specifically disapprove of the procedure used in this case of terminating parental rights on a certain date with the provision that the termination shall become effective at a later date. We agree with the Supreme Court of North Dakota, which specifically disapproved this approach in *In re A. N.*, 201 N.W.2d 118 (N.D. 1972). In that case the court stated at 121-22:

This court does not approve of a termination that is, in effect, prospective in operation. If a possibility of a correction in an existing situation exists, it would be preferable, we believe, to adjourn the hearing under a temporary order of placement without a future termination date. Upon a rehearing, if the conditions still exist, an immediate termination may then be made. A time lapse in the effectiveness of a termination order has a disruptive influence on both parent and child. It is with regret that false hopes are raised, and we should discourage continuing controversy over child custody.

We further hold that such a delayed effective date for

termination, when ordered as it was in this case, operates to change the burden of proof to a parent to prove the parent has complied with a plan. Such a shifting of the burden of proof is improper. The burden remains on the State throughout both the adjudication and disposition hearings, although such hearings may be heard in segments; to prove all facts necessary for the termination of parental rights.

We note that such a delayed time also raises questions as to the finality of a court order. In this case, however, where there was a specific continuance of the hearing from May 19, 1982, to January 5, 1983, there is no question that G.'s appeal to the district court has been properly taken from the January 12, 1983, order.

We further note that Neb. Rev. Stat. § 43-246(4) (Reissue 1984), formerly substantially set out in § 43-201.01(4) (Reissue 1978), states that the juvenile court act shall be construed to "assure every reasonable effort possible to reunite the juvenile and his or her family." In this case we see no effort to reunite G. with her three children at any time, nor can we see any effort to keep the children together or at least in some proximity with one another and G. Aside from G.'s rights, juvenile courts must recognize, if possible, the rights of siblings. In this case J.N.J. has the right to know his older brother and sister, and the older children have the right to know their younger brother.

We disapprove of combining the adjudication and disposition phases of a case in juvenile court in one hearing. We note that in Neb. Rev. Stat. § 43-279 (Reissue 1984), statutory provision is made for adjudicating the status of children "by a preponderance of the evidence." It is clear that parental rights may not be terminated except by "clear and convincing evidence." Santosky v. Kramer, supra at 748. Without in any way determining the effect of the two statutory burden of proof requirements, we simply note that the combination of both issues in one hearing can lead only to confusion.

Finally, we disapprove of the extraordinary lapses of time occurring in this case both with and without court participation. At the time of the temporary relinquishment of the children in March of 1980, Neb. Rev. Stat. § 43-206.03(1) (Reissue 1978) provided, "The hearing as to a child in custody

of . . . the court shall be held as soon as possible after the petition is filed." Effective July 1, 1982, Neb. Rev. Stat. § 43-278 (Reissue 1984) provides, "The hearing as to a juvenile in custody of . . . the court shall be held as soon as possible but, in all cases, within a six-month period after the petition is filed." In this case, after G.'s temporary relinquishment was signed on March 14, 1980, the next hearing as shown by the record was February 3, 1982, and the final hearing was held on January 5, 1983. The matter was appealed, and affirmed by a district court on October 18, 1983. On G.'s motion, a new trial was granted by a successor district judge because proper evidence of prior hearings was not submitted by the State. The juvenile court's decision was finally affirmed on April 30, 1984. After the last of the briefs herein was filed on November 13, 1984, the case was argued to this court on February 4, 1985.

The $5^1/_2$-year period that has passed in this case since the filing of the original petition on October 22, 1979, is almost equal to J.N.J.'s current age of $5^1/_2$ years, and is a very substantial part of L.J.'s current age of $8^1/_2$ years and J.J.'s age of $6^1/_2$ years. For the State to now argue that the children have now become so "bonded" to their foster parents as to require termination of parental rights in this case is to defy legal logic. By separating a parent from that parent's children for extraordinary lengths of time, the State could justify termination of any parental rights. This cannot be, and is not, the law.

We have said that a child must not be made to await uncertain parental maturity. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984). That rule is sound. However, the rule should not be used to trod upon the rights of the parent or the children.

It is true that parental rights are not inalienable. *State v. Wedige*, 205 Neb. 687, 289 N.W.2d 538 (1980). Nonetheless, "The integrity of the family unit, in this instance the continuing legal and social relationship of parent and minor child, is one of the fundamental rights guaranteed by the Constitution of the United States." *State v. Metteer*, 203 Neb. 515, 519, 279 N.W.2d 374, 377 (1979). See, also, *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). Constitutional rights should

not lightly be alienated.

The orders terminating G.'s parental rights are reversed. The causes are remanded to the district court to be remanded to the appropriate juvenile court for further proceedings pursuant to this opinion. Such proceedings shall begin within 30 days of the issuance of the mandate herein. In this connection we note the provisions of Neb. Rev. Stat. § 43-288 (Reissue 1984), which shall be applied in this extraordinary case if consistent with the safety of the children at this late date.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

KRIVOSHA, C.J., concurs in the result.