IN RE INTEREST OF TEELA H., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. KATHY H., APPELLANT.
547 N.W.2d 512

Filed May 7, 1996.   No. A-95-963.

Byron M. Johnson, Scotts Bluff County Public Defender, and W.E. Madelung for appellant.

Deborah A. Birgen, Deputy Scotts Bluff County Attorney, for appellee.

Michelle M. Dreibelbis, guardian ad litem.

HANNON, SIEVERS, and INBODY, Judges.

SIEVERS, Judge.

Teela H., a 4-year-old girl who has been in long-term foster care, experiences separation anxiety at the prospect of being removed from her foster parents to return to her natural mother. The Scotts Bluff County Court, sitting as a juvenile court, overruled the motion of the natural mother, Kathy H., to return Teela to her. Kathy appeals that ruling to this court. The trial court also adopted the Department of Social Services (DSS) case plan of July 17, 1995, which provided for continued, but limited, visitation between Kathy and Teela.

## PROCEDURAL BACKGROUND

The juvenile proceedings involving this child have been the subject of a previous opinion of this court, *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995) (*Teela I*). We are able to take notice of the judicial action in a prior related case. See, *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990), *Wischmann v. Raikes*, 168 Neb. 728, 97 N.W.2d 551 (1959).

Teela was born to Kathy on December 29, 1991. A petition was filed in Scotts Bluff County Court on June 3, 1992, alleging that Teela lacked proper parental care, citing Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993), by reason of the fault or habits of Kathy. Teela was placed in the temporary custody of DSS, but was briefly returned to Kathy's temporary custody on a trial basis from July 14 to August 14, 1992. Since August 1992, Teela has lived with Dave C. and Nancy C., her foster parents.

The initial DSS case plan, adopted by the court on October 21, 1992, had two parts. The first part set a target date of February 1993 to establish Dave and Nancy as guardians for Teela. The second part was, in the event Kathy changed her mind about the guardianship, a rehabilitative plan establishing the following goals for Kathy: (1) to remain sober, (2) to attend two Alcoholics Anonymous (AA) meetings each month, (3) to meet with an alcohol counselor, (4) to complete a parenting

class, (5) to obtain her GED, and (6) to attend individual counseling to deal with her background as an abused child. Unsupervised visitation was provided for in the plan.

Kathy moved to Cheyenne, Wyoming, although precisely when is not in the record, and visitation occurred both in Cheyenne and in Scottsbluff. On November 29, 1993, Kathy filed a motion, seeking to have the custody of Teela returned to her. On February 17, 1994, the trial court authored a letter stating its intention to overrule this motion. In July 1994, another hearing was held. The bill of exceptions from the July 1994 hearing was offered and received in evidence in the July 1995 hearing, which is the subject of the instant appeal.

We first summarize the evidence from the July 1994 hearing. That record showed that Kathy had completed her parenting classes, was attending AA meetings, was receiving family dysfunctional counseling, and was taking college–level courses at a junior college. Melody Wilson, a social worker from the Wyoming Department of Family Services, testified that she had completed a home–study report and found Kathy's home and family appropriate. Wilson recommended the reunification of Kathy and Teela. Wilson admitted, however, that the standard she was applying in her recommendation was that used in Wyoming, which was whether "eminent danger" was posed to the child by virtue of reunification.

The record from the July 1994 hearing reveals that in May 1994, approximately 1 month after weekend visitations in Cheyenne began, Teela, then age 2½, began exhibiting behavioral problems, including being angry and kicking, spitting at, and hitting people. She became "clingy" to Nancy. Dr. James Sorrell, a psychiatrist, examined Teela and diagnosed her as suffering from severe separation anxiety. Dr. Sorrell opined that Teela was emotionally attached to Dave and Nancy and was reacting to the threatened loss of this relationship. He recommended that the weekend visits be terminated and that Kathy's visitation with Teela be supervised and occur in Scottsbluff. Kelly Case, the DSS social worker assigned to this case, testified at the July 1994 hearing that her recommendation was the completion of the guardianship with Dave and Nancy. This recommendation was based upon Teela's anxiety disorder

and upon the period of time she had been in the care of Dave and Nancy, which was over 80 percent of her life. Case's recommendation was not because of any failure by Kathy to comply with the rehabilitative plan. Case testified in July 1994 that since approximately January 1994, Kathy had complied with most of the recommendations in the rehabilitative plan. In a journal entry of August 2, 1994, the trial court ordered that the unsupervised weekend visits in Cheyenne be terminated, that Kathy's visitations with Teela be held in Scottsbluff, and that the visitations " 'be supervised by the Department of Social Services as recommended by Dr. Sorrell.' " *Teela I*, 3 Neb. App. at 607, 529 N.W.2d at 138. The first appeal in this matter followed.

In *Teela I*, Kathy assigned error with respect to the letter ruling of February 17, 1994, which appeared to overrule her motion to return custody. The court in *Teela I* found that the judge's letter was not a final appealable order with regard to Kathy's motion to return Teela's custody to her, and, consequently, this court held it had no jurisdiction over her claim that the court erred in not sustaining her motion to have custody of Teela returned to her.

The court in *Teela I* also found that the county court, by granting Dr. Sorrell the authority to determine the time, manner, and extent of Kathy's visits with Teela, had delegated to a third party a matter which should have been judicially determined. Consequently, that order was reversed, and the matter remanded with directions "to determine visitation privileges if and when appropriate." *Teela I*, 3 Neb. App. at 611, 529 N.W.2d at 139.

## PROCEEDINGS AFTER REMAND

After the remand in *Teela I*, Kathy filed another motion for an order returning custody of Teela to her. A hearing on that motion was held July 28, 1995. The evidence offered at that hearing included the bill of exceptions from the July 1994 hearing. Kathy's counsel stated on the record at the outset that the purpose of the July 1995 hearing was to return Teela to her mother, but if that was not accomplished, then visitation pursuant to the mandate from the Nebraska Court of Appeals in

*Teela I* should be established. Thus, we turn to the evidence from the July 1995 hearing.

Kathy's testimony was that she was living in the same place with the same man as she had been in July 1994. Kathy's second child was born December 28, 1994. Her new baby was being cared for by an experienced sitter. Kathy testified that this child was free of problems and not subject to any social service scrutiny in either Nebraska or Wyoming. Kathy testified that she had been going to counseling at Southeast Mental Health Center in Cheyenne, seeing Susan Kotowicz, who was working with her on "my past." Kathy testified that she had been working for 3 or 4 months with this therapist, but that there was not much more to do unless Teela was returned to her. She related that the Wyoming Department of Family Services had closed her case, as there was no danger to Teela should her custody be returned to Kathy. Kathy said she had completed all parenting classes that she could without Teela being in her home. Kathy testified that she had been sober for 3 years. On cross–examination, Kathy testified that she attended three AA meetings a week, but did not have signed documentation of her attendance.

According to Kathy, visitation with Teela went well, but she admitted problems in making the visitation due to her job, her pregnancy, her finances, and the lack of a dependable automobile. Kathy related that during her pregnancy with her second child, she experienced back pain and leg numbness which prevented her from driving and interfered with her ability to come to Scottsbluff for visitation. Kathy has been employed at the Country Buffet restaurant in Cheyenne since late May 1995, and her work schedule varied, but apparently often included weekends. Visitation with Teela was scheduled for Fridays from 1 to 4 p.m. Kathy testified that she went to visitation as much as possible, and when she did not work on Friday, she tried to go to Scottsbluff. Kathy testified that although DSS had asked for her work schedule, she had not been able to get it because of managerial problems at her employment. Kathy testified that she had missed about 10 visitations because of her job.

When asked if she wanted Teela returned to her, Kathy responded affirmatively. When asked why, she responded, "Because I love her. I want to put her in bed at night. I want to get up in the morning and make her breakfast, give her her three meals a day, provide her with the nourishment she needs through love." When asked if she had signed any releases of information for Dr. Sorrell, she testified that she signed them in her counselor's office and that the counselor said she would return them as soon as they were filled out.

When asked about her familiarity with "Teela's rages," Kathy indicated that she was not familiar with them, because the child "does not really have them with [her]," and that she had seen them only once or twice since the July 1994 court proceedings.

When asked what she had done to learn how to deal with Teela in these rages, Kathy testified that she talked to her counselor and that she had asked Dr. Sorrell, who told her it was up to her counselor. Kathy testified:

> I specifically asked him — I said, "What can I do to help Teela?" And he said, "Well, you need to work with your counselor on that." I said, "Can you send my counselor information so I know what to work on." And he said he would do that, but we have not received anything.

Case testified in the July 1995 hearing and related that she had been involved with Teela since the beginning of her case. She testified that since the July 1994 hearing, DSS has had Teela in counseling with a play therapist as well as seeing Dr. Sorrell. Additionally, a family support worker was assigned to work with Kathy on parenting skills. Case testified that visitation had been set for every Friday from 1 to 4 p.m. Since the last court hearing in July 1994, Case testified there had been 36 scheduled visits. Of these visits, DSS canceled five, each time providing an opportunity for rescheduling, of which Kathy did not avail herself. Case testified that 17 visits were canceled by Kathy and that there were 6 visits when Kathy simply did not show up. In all, visitation occurred on eight occasions.

With respect to counseling, Case testified that in December 1994, she informed Kathy that the previously executed release of information form was no longer effective and that if she started counseling again, a new form would be needed so that

Case could send information about Teela to Kathy's counselor. Case never received the authorization to allow Teela's therapist to provide information to Kathy's therapist. Case testified that the plan to enable Kathy to deal with the issue of Teela's separation anxiety was counseling, but that Kathy had not begun counseling until June 1995 and had never signed any other releases of information to allow the exchange of information to apprise Kathy's counselor of Teela's condition and treatment.

Case testified that she had asked Kathy for documentation as to why visits with Teela were missed, but the documentation had not been received. However, Kathy did introduce into evidence medical records concerning her pregnancy, a bout with a stomach virus, and a diagnostic workup for back pain. However, no physician testified or provided evidence that Kathy was unable to travel to Scottsbluff, except for a medical excuse prescribing bed rest for June 27 to 29, 1995, because of "stomach cramps." The medical records concerning her pregnancy show that on October 19, 1994, she sought an excuse "not to travel to Scottsbluff," which was refused. However, on October 11, the doctor's records state: "Excuse given for today's visitation in Scottsbluff." On December 9, the doctor's notes indicate that it was "suggested she not travel too far." We observe that the doctor's notes of July 1, 1994, nearly 6 months before the birth of her second child, reflect: "[A]sked for excuse not to travel? [A]sked for excuse not to work also."

Nancy, the foster mother, testified to Teela's pattern of having "rages" on Thursday nights preceding a visit, and if there was a visit with Kathy, there would be rage–like behavior incidents in the following days. Nancy described Teela's behavior as totally out of control, "like a seizure." Nancy testified that Teela had been seeing Dr. Sorrell once a month plus a therapist, Ellen Jensen, twice a week until the summer of 1995, when those visits were reduced.

Also in evidence is the July 20, 1995, report from Dr. Sorrell. His report states:

> I also think it quite important to note that Teela has rages following her visits with her natural mother Kathy. These rages, of course, are a protest and an attempt on Teela's part to manipulate so that she doesn't have to

return to what she perceives as an unwanted environment. These rages also provide her with an outlet to express the anger and the frustration she feels in regard to her visits with her mother. It is my suspicion that there is very little limit setting on her visits and the rages indicate a negative reaction to the reintroduction into the structured environment that she needs in order that she may continue to develop appropriately.

I do feel these general inconsistencies are [detrimental] to Teela's well–being. I see no bonding with her natural mother. Also concerning to me is the inconsistency that the mother shows in regard to her interventions that she is to be currently working on. . . . I feel that the appropriate care of Teela and Kathy's inability to appropriately care for Teela needs to be considered. I know that Teela requires much patience and emotional support that Kathy cannot provide. She does not posses[s] the skills needed to care for Teela in this firm but loving way.

After noting that he had not received information that Kathy is receiving consistent psychotherapy or working to develop the special skills Teela's care requires, Dr. Sorrell opined that "it is my strong opinion that she cannot provide an appropriate environment for Teela." Finally, Dr. Sorrell concluded that it was his recommendation that Teela remain in foster care and that it was not to the benefit of Teela to be returned to her natural mother.

### JUVENILE COURT DECISION

The juvenile court entered an order on August 18, 1995, which (1) overruled the motion to return the child and (2) adopted "Plan B of the [DSS] Case Plan and Court Report of July 17, 1995." Plan B was that the mother would visit Teela once a week in Scottsbluff, during which she would "work on parenting skills, bonding, and attachment." The visits would be supervised, and Diane Crystal, a family support worker, would "encourage parenting skills, bonding, and attachment." Additional parts of Plan B were to receive therapy from a counselor in Wyoming and "[i]n counseling, [to] work on issues related to Teela's emotional problems and how Kathy is directly

related to this." Kathy was also to work on how she can "understand Teela's problems and change her behavior to better meet Teela's needs." Kathy was also to remain sober and not use alcohol or drugs. Kathy now appeals that order to this court.

## ASSIGNMENTS OF ERROR

Kathy assigns two errors: (1) The trial court abused its discretion by denying the return of custody despite Kathy's completion of the conditions set forth in a plan for reunification, and (2) the trial court violated Kathy's rights to due process by failing to return Teela and for not setting conditions, within Kathy's ability to perform, by which Teela's return could be accomplished.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of L.P. and R.P.*, 240 Neb. 112, 480 N.W.2d 421 (1992).

## DISCUSSION

Teela was born December 29, 1991. In June 1992, she was removed from Kathy's custody and has never returned, but for a 1–month trial period in the summer of 1992. Therefore, at the time of the July 1995 hearing from which this appeal emanates, Teela had spent in excess of 80 percent of her life in foster care and since August 1992, she has been at the home of Dave and Nancy. The reason for the original adjudication was very serious neglect of Teela by Kathy. Kathy agreed to the establishment of a guardianship, but by December 1993, a guardianship had not been completed. Nancy and Kathy were apparently well acquainted, and Kathy had a hand in the selection of the foster parents. Kathy encouraged Teela to call Dave and Nancy "daddy and mommy." However, in December 1993, Kathy decided that she wanted Teela returned to her and that she was no longer interested in establishment of the guardianship.

A rehabilitative plan was then established. Kathy argues that the record from the July 1994 hearing establishes her compliance with the plan. We are referred to the following testimony from Case during the July 1994 hearing:

> Q. Okay. As far as the original recommendations that were adopted by this court, do you feel that [Kathy] has completed most of them?
>
> A. Yes, I do.
>
> Q. And are your concerns about reunification at this point based on failure to comply with the plan or is this a new issue dealing with Teela's separation anxiety?
>
> A. It would be the new issue for Teela.
>
> Q. Okay. So you're satisfied with her compliance then with the plan?
>
> A. Yes.

Kathy also points to the testimony from Wilson, the social worker for the Wyoming Department of Family Services, who found Kathy's home and family appropriate, based on 23 home visits. Wilson testified at the July 1994 hearing that Kathy had participated in AA, had dysfunctional family counseling, and was involved in junior college classes. Wilson testified that her recommendation was that Teela be returned to Kathy, and explained that services, including psychiatric counseling, would be offered to Kathy and Teela to deal with any separation anxiety issues. Wilson opined that it would be more difficult for Teela to separate from her foster parents as time passed and that any such separation should be done quickly to minimize damage.

Kathy cites the rule that a child cannot and should not be suspended in foster care, or be made to await uncertain parental maturity. *In re Interest of C.N.S. and A.I.S.*, 234 Neb. 406, 451 N.W.2d 275 (1990). She asserts a corollary: When the parent has reached maturity, proven by compliance with a reunification plan, the child should not be left in the limbo of foster care, but, rather, returned to the parent. The proposition as drawn is hard to dispute as a ·generalized statement; but it does not answer the issues we face, given the record and the applicable law, and it may not sufficiently factor into consideration in a particular case the child's best interests.

■■■ The best interests of Teela are what must concern us, as the law is clear that this is our guidepost. In controversies touching the custody of children, the welfare and the best interests of the child surpass considerations of strictly legal rights. *In re Application of Schwartzkopf*, 149 Neb. 460, 31 N.W.2d 294 (1948). More recently, the Nebraska Supreme Court has said the "first and primary consideration in any case involving the custody of a child is the best interest of the child." *State v. Loomis*, 195 Neb. 552, 557, 239 N.W.2d 266, 269 (1976). Moreover, the right of a parent to the custody and control of his or her child is a natural right protected by the Constitution, but such right is subject to the paramount interest which the public has in the protection of children from abuse and neglect. *In re Interest of W.*, 217 Neb. 325, 348 N.W.2d 861 (1984). Additionally, a court's duty to decide custody cases is based upon the best interests of the child, which means that the parental rights may be subjected to the rights of the child which make up its best interests. *In re Interest of Wood and Linden*, 209 Neb. 18, 306 N.W.2d 151 (1981).

The record which we are presented with now is different from the record from the July 1994 hearing alone. Admittedly, the record in July 1994 established strong evidence of compliance at that time with the rehabilitation plan, but there was evidence then that Teela was experiencing separation anxiety. The record before us encompasses not only the July 1994 hearing, but the July 1995 hearing. This record establishes that Teela's separation anxiety as diagnosed by the psychiatrist continues to manifest itself, that Kathy's exercise of visitation with Teela has been far less than it should have been, and that there is evidence of Kathy's failure to take the steps necessary, via her own counseling, as well as by cooperating with Teela's treating psychiatrist and counselors, to deal with Teela's emotional problems. Finally, there is expert opinion testimony that reunification is not in the best interests of the child. Clearly, there is evidence which supports the trial court's decision. That said, there are, nonetheless, several troubling aspects to the case upon which we briefly comment.

We are troubled by the fact that the principal obstacle to reunification appears to be that Teela suffers psychological

distress when she perceives the potential of being separated from her foster parents. If there is ever to be reunification between Kathy and Teela, it is likely that Teela will suffer emotional distress (or "separation anxiety" as Dr. Sorrell labels it), at least to some extent, from the process of leaving her foster parents. Yet, to use the occurrence of such distress as justification for denying reunification means that reunification of parent and child through and after rehabilitation of parental shortcomings becomes illusory. Given that the Legislature has mandated that the juvenile code be construed "to assure every reasonable effort possible to reunite the juvenile and his or her family," Neb. Rev. Stat. § 43–246(4) (Reissue 1993), it would seem that inherent in the institutionalization of foster care is acceptance of at least some degree of emotional upset and trauma when formerly neglected or abused children are removed from loving and caring foster parents and returned to their natural parent or parents. We do not see how it could be otherwise. Typically, the point of discussion will center on "bonding," e.g., the child is bonded with the foster parent or parents, but not so with the natural parent. But using the bonding theory when applying the "best interests" standard should not be camouflage for an insidious "best resources" test.

Some courts have expressed concern over harsh results to parents of few resources if child placement decisions are based solely on the need for continuity in care. See *Matter of Guardianship of K.L.F.*, 129 N.J. 32, 45, 608 A.2d 1327, 1333 (1992) (observing that "facile use of the bonding theory can increase the risk of institutional bias militating in the direction of permanent placement and adoption of children in foster care"). The New Jersey Supreme Court in *Matter of Guardianship of J.C.*, 129 N.J. 1, 608 A.2d 1312 (1992), in a termination of parental rights case, explored the slippery ground represented by competing psychological theories about the effect of parental bonding in a thoughtful opinion which provides "food for thought" for those who try to do right by young children who, by no choice of their own, find themselves in the foster care system. The New Jersey court stated that variances in recommendations for children largely derive from different "assumptions concerning the fragility versus resiliency of the

child psyche." *Id.* at 19, 608 A.2d at 1320. The court's warning in *Matter of Guardianship of J.C.* bears repeating:

> Moreover, there are the grave pitfalls that may be encountered in the application of otherwise sound psychological parenting and bonding theories. Scholars and some courts suggest that theories of parental bonding may be relied on too often to keep children in foster care rather than return them to their parents. *E.g., In re Interest of L.J.*, 220 Neb. 102, 368 N.W.2d 474, 483 (1985).

129 N.J. at 20, 608 A.2d at 1321.

The Nebraska case cited by the New Jersey Supreme Court contains the following language:

> For the State to now argue that the children have now become so "bonded" to their foster parents as to require termination of parental rights in this case is to defy legal logic. By separating a parent from that parent's children for extraordinary lengths of time, the State could justify termination of any parental rights. This cannot be, and is not, the law.
>
> We have said that a child must not be made to await uncertain parental maturity. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984). That rule is sound. However, the rule should not be used to trod upon the rights of the parent or the children.

*In re Interest of L.J., JJ., and J.N.J.*, 220 Neb. 102, 115, 368 N.W.2d 474, 483 (1985).

We suggest that a legal system which allows removal of a neglected or abused child from its parent, placement in foster care during parental rehabilitation, and then removal from foster care and return to the natural parent has, of necessity, opted for the resilient "child psyche" concept. Therefore, in the instant case, that Teela has manifested separation anxiety, *by itself*, seems patently insufficient to deny reunification—to conclude otherwise would be to make rehabilitation and reunification a sham.

In *Matter of Guardianship of J.C., supra*, the New Jersey court remanded the case for additional evidence addressing whether the two children involved had bonded with the foster parents and, if so, whether breaking that bond would cause the

children serious psychological or emotional harm. In doing so, the court found that the social workers were not qualified to express opinions concerning psychological bonding and the harmful consequences from its disruption. The New Jersey court also characterized the reports of the psychologists as useful but conclusionary and lacking supporting explanations.

Here, the record is less than overwhelming. The psychiatrist, Dr. Sorrell, who diagnosed the separation anxiety and counseled strongly against reunification, did not testify. The opinions from his letter are conclusionary and without well developed rationale. But it seems clear that consideration of the psychological impact upon Teela, if separated from her foster parents, is indeed an appropriate consideration, in the mix of factors to consider, in situations such as this. See *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992) (parental rights termination case involving Indian Child Welfare Act where court looked to psychological impact on children from separation from foster parents of nearly 7 years, which would result from transfer of custody to Rosebud Sioux Tribal Court). See, also, *Nielsen v. Nielsen*, 217 Neb. 34, 348 N.W.2d 416 (1984) (holding that best interests of children, due to adverse psychological impact of visitation, required that there be no visitation with their father at penitentiary, who was serving two life sentences for murder of children's maternal grandparents); *In re Interest of R.D.J. and K.S.J.*, 215 Neb. 724, 340 N.W.2d 415 (1983) (psychological testing evaluating the progress in the development of children); *Fleharty v. Fleharty*, 202 Neb. 245, 248, 274 N.W.2d 871, 873 (1979) (court chastised parent who appears to be unaware of "possibility of permanent psychological damage"). We consider it beyond reasonable dispute that courts involved in consideration of juvenile matters can and should look to the emotional impact upon the children of proposed actions. Thus, although the psychological evidence is not well developed, we cannot ignore Dr. Sorrell's report and the opinions expressed therein. That report militates against reunification, but it does not say what can and should be done to accomplish reunification.

That Teela may have bonded with her foster parents and suffers psychological distress when she perceives a threat to that

bond is ultimately traceable to the fact that it was Kathy, who in the first instance, failed to take responsibility by providing proper care for her child. Kathy compounded the problem by initially choosing guardianship for Teela, and she obviously encouraged the attachment between Teela and her foster parents by encouraging her child to place Dave and Nancy in the role of "daddy and mommy." Kathy's failure to regularly and diligently exercise visitation with Teela contributes to the lack of attachment between Kathy and Teela and to the attachment which exists between Teela and her foster parents.

Kathy's counsel asserted at oral argument that Kathy's shortcomings with respect to visitation between July 1994 and July 1995 are attributable to the failure of the Scotts Bluff County Court to reunite her with the child and her frustration over the result in *Teela I*. Although we might understand a degree of frustration at not securing reunification, we cannot embrace the proffered excuse. Being a parent requires more than a biological link to the child; it requires commitment, hard work, perseverance, love, and parenting skills. A parent who has failed to care for his or her child and lost custody to the foster care system means that such parent, in addition to rehabilitating their parental shortcomings, must persevere in their commitment to the child. Without this, courts are indeed hard pressed to make the requisite finding that reunification is in the best interests of the child.

Kathy failed to persevere with visitation after the trial court initially declined to order reunification with Teela. The record shows that between November 1994 and July 24, 1995, there were 36 visits scheduled for Kathy and Teela. Of these visits, DSS canceled 5, Kathy canceled 17, and Kathy failed to show up on 6 occasions without any notice. Thus, only eight visits were held. Granted, the record allows the conclusion that a few visits were unavoidably missed due to Kathy's pregnancy, some illness, and car trouble. Nonetheless, we cannot ignore Kathy's apparent lack of commitment to Teela. Kathy has obviously made certain choices which have far–reaching consequences: She has chosen to live in Cheyenne, making visitation difficult, and she has borne another child, increasing the demands upon her time.

In conclusion, based upon our de novo review, we hold that the trial court properly denied the motion for reunification because of the combination of sporadic visitation, Teela's emotional distress, and Kathy's failure to take the steps necessary via her counselor and Teela's counselor to work on understanding and improvement of Teela's emotional condition. Although Kathy has assigned error claiming a denial of due process because the court did not return Teela to her, that assignment is incompletely argued. Moreover, due process, although eluding precise definition, is a notion requiring that when government intervenes in its citizens' lives that there be fundamental fairness which involves, among other things, notice and an opportunity to be heard. See *In re Interest of L. V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). Our review of the record fails to uncover a denial of due process with respect to the trial court's decision to deny Kathy's request for reunification.

The second part of Kathy's due process claim is that due process was denied because the court failed to define precisely what she must do to obtain reunification. The issues involved in juvenile custody cases do not lend themselves to formulaic articulation of what must be done to accomplish reunification and to attempt such would perhaps cross into the dangerous territory represented by advisory opinions. Thus, this assignment of error is without merit.

AFFIRMED.