IN RE INTEREST OF PHOEBE S. AND REBEKAH S.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
REGINA S., APPELLANT.
664 N.W.2d 470

Filed June 17, 2003.   Nos. A-02-905, A-02-906.

Richard K. Bollerup, of Bollerup & Huxoll, P.C., for appellant.

Shellie D. Sayers, Deputy Lancaster County Attorney, for appellee.

HANNON, SIEVERS, and INBODY, Judges.

SIEVERS, Judge.

The State of Nebraska filed a motion to terminate a mother's parental rights to two of her four children. The separate juvenile court of Lancaster County, Nebraska, terminated the mother's parental rights to those two children. The mother appeals.

## I. FACTUAL BACKGROUND

On November 24, 1997, Rebekah S., born March 5, 1997; Hezekiah S., born May 9, 1988; and Josiah S., born March 1, 1985, were removed from the care of their parents, Regina S. and Andrea S., by the Lincoln Police Department and placed in the emergency custody of the Nebraska Department of Health and Human Services (DHHS), based on the family's having no housing or financial means to obtain shelter. On November 25, 1997, the separate juvenile court of Lancaster County ordered and

granted temporary legal custody of Rebekah, Hezekiah, and Josiah to DHHS, based on the best interests of the children. On January 16, 1998, Rebekah was placed in the foster care of Dorothy G. and has since remained in her care and custody.

On January 30, 1998, after an adjudication hearing, the juvenile court found Rebekah, Hezekiah, and Josiah to be children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 1997) because they were homeless, destitute, and lacked proper parental care by reason of the faults or habits of Regina and Andrea. The court ordered that the children remain in the temporary legal custody of DHHS. After various dispositional orders, the State was given leave on August 31 to file an amended supplemental petition, and after a second adjudication hearing, the juvenile court again found Rebekah, Hezekiah, and Josiah to be children as defined by § 43-247(3)(a) (Reissue 1998) because they were homeless, destitute, and lacked proper parental care by reason of the faults or habits of Regina and Andrea, and ordered that the children remain in the temporary legal custody of DHHS. On January 14, 1999, after a rehabilitation plan was formulated by DHHS and approved by the court, the juvenile court found that reasonable efforts had been made to return custody of Rebekah, Hezekiah, and Josiah to Regina and Andrea but that it was in the children's best interests that they remain in the temporary legal custody of DHHS.

On February 1, 1999, Phoebe S. was born to Regina and Andrea. On February 2, the Lincoln Police Department removed Phoebe from her parents' care and placed her in the emergency custody of DHHS, based on the following allegations: Regina and Andrea suffered from a variety of mental health problems according to psychological evaluations; Regina and Andrea failed to comply with the DHHS plan of rehabilitation; Phoebe's three siblings continued to remain in the temporary legal custody of DHHS; and Regina and Andrea did not have appropriate housing. That same day, Phoebe was also placed in the foster care of Dorothy and has since remained in her care and custody.

## II. PROCEDURAL BACKGROUND

On February 3, 1999, the State filed a motion for termination of Regina's and Andrea's parental rights to Rebekah, Hezekiah, and Josiah (motion I), alleging that Regina and Andrea were

unable to discharge their parental responsibilities because of mental illness or mental deficiency, that there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period in support of termination based on Neb. Rev. Stat. § 43-292(5) (Reissue 1998), and that termination of Regina's and Andrea's parental rights would be in the children's best interests. On the same date as above, the State also filed a separate petition and motion to terminate Regina's and Andrea's parental rights to Phoebe (motion II), alleging that Phoebe was homeless, destitute, and without proper parental support pursuant to § 43-247(3)(a); that the parents had the same mental health allegations as previously alleged; and that termination of Regina's and Andrea's parental rights would be in Phoebe's best interests.

On April 14, 1999, the juvenile court found that reasonable efforts had been made to return custody of Phoebe to Regina and Andrea but that it was in the child's best interests to remain in the temporary legal custody of DHHS.

On May 6, 1999, a hearing was had on motions I and II; however, it came to the court's attention that Regina was of Native American ancestry, specifically Oglala Sioux, thus triggering the statutory provisions of the Nebraska Indian Child Welfare Act (ICWA), Neb. Rev. Stat. § 43-1501 et seq. (Reissue 1998), relating to termination of parental rights to Indian children. Pursuant to §§ 43-1503 and 43-1504, the juvenile court granted a continuance to determine if Phoebe, Rebekah, Hezekiah, and Josiah were of Indian descent and if the Oglala Sioux Tribe had jurisdiction. Subsequently, Regina and Andrea filed a motion to transfer the case to the Oglala Sioux Tribal Court, and the trial was stayed pending a jurisdictional hearing.

The jurisdictional hearing was had on December 20, 1999. On March 20, 2000, the juvenile court found that Phoebe, Rebekah, Hezekiah, and Josiah were Indian children but that they were not domiciled on the Oglala Sioux Tribe Reservation, and the court therefore denied the motion to transfer, based on the best interests of the children. Motions I and II were again set for trial in the separate juvenile court of Lancaster County.

Throughout the aforementioned juvenile court hearings, Regina regularly and consistently participated in supervised

visitations with her four children, according to Linda Brown, a family support specialist who supervised and facilitated the visitations. On October 23, 2000, however, a hearing was had in the juvenile court regarding the visitation plan, and on November 30, the court terminated Regina's and Andrea's supervised visitation with Phoebe and Rebekah. The juvenile court found that visitation was no longer in the children's best interests, based on a report by Dr. Colleen Stormberg, a psychologist assigned to the case. Subsequently, Regina agreed to relinquish her parental rights to Phoebe and Rebekah in exchange for a "Communication and Contact Agreement" with DHHS that allowed her to visit the girls four times a year. Regina visited Phoebe and Rebekah in December 2000 and February 2001. Sometime after Regina's last visit with the girls, she rescinded the relinquishment of her parental rights because she "just couldn't go through with it."

On May 11, 2001, the State amended motion I to add an allegation that Regina's and Andrea's parental rights to Rebekah, Hezekiah, and Josiah should be terminated pursuant to § 43-292(7) because the children had been in out-of-home placement for 15 or more months of the most recent 22 months. The State also added two additional allegations pursuant to the Nebraska ICWA, § 43-1505(4) and (6), and by interlineations on a date we cannot ascertain from the record, the State removed Hezekiah and Josiah from the case and removed the original allegation of mental illness under § 43-292(5). Also on May 11, the State amended motion II to add allegations based on §§ 43-292(7) and 43-1505(4) and (6) as additional statutory grounds for termination of parental rights. On November 1, the State amended motion II for a second time, removing the allegation based on § 43-292(5), thus basing termination on §§ 43-292(7) and 43-1505(4) and (6). Trial was had in early March 2002.

### 1. STATE'S EVIDENCE

Regina testified that the State has had custody of Rebekah since November 24, 1997, and Phoebe since February 2, 1999. Regina stated that she was currently taking Zoloft and Seroquel for depression anxiety, hair-pulling, and sleeplessness. Regina testified that the last time she visited with Phoebe and Rebekah was in February 2001. Regina stated that Andrea had relinquished

his parental rights to the girls. Regina stated that Andrea had been hospitalized and incarcerated in the past and that he was currently taking medication to calm him down. Regina testified that she would separate from Andrea if that was required to get her children back; however, she was unsure if she would divorce Andrea.

Charlie Bennett, a case manager for DHHS, testified that he became the sole and ongoing caseworker in Regina's case in May 1998. Bennett testified that in an effort to reunify Regina's family, he did the following: arranged for therapeutic providers and parenting classes ("P.A.C.T. program") for Regina and Andrea; personally supervised the visitation with the children; provided for transportation (bus passes); arranged evaluations for the family; kept in regular contact with Regina, Andrea, Dorothy, and the children; provided medical coverage for the children; and prepared case plans and court reports. Bennett testified that Phoebe and Rebekah were in a "stable" and "nurturing environment" at Dorothy's home and that the girls felt safe there. Bennett stated that Phoebe, Rebekah, Hezekiah, and Josiah, still resided in foster care even though all reunification efforts had been made.

Bennett testified that Dr. Helen Montoya, Dr. Stormberg, and Dr. Mary Payne have all provided therapeutic support for Regina's family through DHHS. Bennett testified that Dr. Montoya performed a psychological evaluation on Regina and Andrea in 1998, that Dr. Stormberg provided therapeutic treatment for Regina and Andrea and carried out an evaluation regarding the relationship between Phoebe and Rebekah and their parents, and Dr. Payne provided therapeutic treatment for Regina.

Bennett testified that he never considered recommending reunification of Phoebe and Rebekah with Regina because of the following observations: Regina and Andrea have had difficulty at times providing a home for their children, Regina and Andrea's relationship has been unstable at times, Regina received disability assistance and has used the money for questionable purposes at times, Regina stopped going to counseling and the parenting classes, and the family has lacked adequate transportation at times. Bennett stated that he arranged the supervised visitation between the children and their parents through Cedars Youth Services (Cedars); however, in October 2000, the supervised visitations with the girls were suspended after an evaluation by Dr.

Stormberg indicated that the visitation was negatively impacting the girls. Bennett stated that it is DHHS' plan that Phoebe and Rebekah continue to reside with Dorothy. Bennett concluded his testimony by stating that he believed it was in Phoebe's and Rebekah's best interests that they have permanency.

On cross-examination, Bennett admitted that Regina and Andrea have maintained a sanitary and adequate apartment for the last 2 years without rental assistance from DHHS. Bennett further admitted that when he became involved in the case in 1998, Regina and Andrea had a place of residence and were not homeless. Bennett testified that Regina has maintained employment throughout his tenure with the case and that she is currently employed and has been working at a restaurant for almost a year. Bennett testified that since he became involved in 1998, Regina's demeanor, her employment situation, and her housing condition have improved. Bennett admitted that after the supervised visitations with Phoebe and Rebekah were terminated in October 2000, DHHS basically did nothing to determine if visitation should restart.

Dr. Stormberg testified that she conducted an evaluation of Regina's family and Dorothy in July and August 2000 in order to see the relationship between the girls and Regina and Andrea and between the girls and Dorothy.

### (a) Girls and Dorothy

Dr. Stormberg stated that during the evaluation, Dorothy said that both Phoebe and Rebekah did not want to visit with Regina and that before each visit, the girls would cry and become angry and upset. Dr. Stormberg testified that during the girls' visit with Dorothy, the girls appeared comfortable with Dorothy and sought out physical contact with her. Dr. Stormberg testified that Dorothy appeared to be a good, attentive, and calm foster parent and that there was a good bond or attachment between Dorothy and the girls.

### (b) Girls and Regina and Andrea

Dr. Stormberg testified that during her visit with Regina, Andrea, and the girls, Regina appeared somewhat anxious about being evaluated. Dr. Stormberg testified that there was a mixture of both appropriate direction and negative redirection between the

girls and Regina. Dr. Stormberg stated that Phoebe and Rebekah did not seek out physical contact with Regina. Dr. Stormberg testified that the girls appeared to be comfortable around Regina but that there was not clear evidence of an attachment or a strong bond between Regina and the girls.

Dr. Stormberg opined that the supervised visits should be suspended on a temporary basis. Dr. Stormberg testified it appeared that Phoebe and Rebekah were in an enduring relationship with Dorothy and were upset by the supervised visits with Regina and that the visits were not beneficial to the girls. Dr. Stormberg testified it appeared that Rebekah was suffering from posttraumatic stress disorder. Dr. Stormberg stated that the girls' attachment to Dorothy had progressed to a stable point but that their attachment to Regina and Andrea had diminished to a "point where it was in the [girls'] best interest to be allowed to continue their attachment to [Dorothy] without further disruption." Dr. Stormberg testified that she recommended Regina and Andrea receive psychological evaluations because in the past, Regina and Andrea's life was very unstable and involved physical aggression, but it appeared that their life had become "quite a bit more stable." Dr. Stormberg thought that an evaluation could determine whether there was any reasonable chance of reunification of the family. Dr. Stormberg testified that a few months after her evaluation, she began a therapeutic relationship with Andrea, counseling him on a weekly basis. Dr. Stormberg concluded her testimony by opining that it is in the best interests of Phoebe and Rebekah that they remain with Dorothy because they have a good, healthy attachment to her and because it is important that the girls have some permanency.

On cross-examination, Dr. Stormberg admitted that she did not evaluate Regina and the girls without Andrea being present. Dr. Stormberg also admitted that Andrea was the most frantic and anxious during the evaluation and that Regina was less so. Dr. Stormberg testified that during the visit between the girls and Regina and Andrea, there was nothing "grossly inappropriate" that occurred, and that Regina read to the girls, played with them, and disciplined them appropriately. Dr. Stormberg also stated that she never witnessed the girls crying or being upset before the supervised visitations.

Dorothy testified that she is a licensed foster care provider. Dorothy stated that Rebekah came to live with her in January 1998, that Phoebe came to live with her in February 1999, and that the two girls have resided with her continuously since then. Dorothy testified that Rebekah was "pretty thin," very quiet, and withdrawn when she first came to live with Dorothy. Dorothy testified that Rebekah is much more open now, interacts well with other children, loves to be read to, and enjoys swimming and playing. Dorothy stated that Phoebe is very outgoing and active, loves to play outside, loves animals, and is very social.

Dorothy testified that when Rebekah returned from the supervised visits with her biological parents, she had night tremors and would cry a lot, wake up in the middle of the night, and just want to be held and cuddled. Dorothy stated that prior to the supervised visits, Rebekah would usually hide, state that she did not want to go, and be withdrawn. Dorothy stated that when Phoebe became older, she too resisted visitation with Regina and Andrea. Dorothy testified that after the supervised visits were suspended, the girls slept better, did not wake up in the middle of the night crying, and appeared more happy and relaxed. Dorothy testified that the girls are part of her family and that she would want to adopt them if she could. Dorothy concluded her testimony by stating that she would continue to care for, provide for, and parent the girls and is committed to both girls on a long-term basis.

Dr. Anne Coyne, a professor of social work at the University of Nebraska-Omaha (UNO), testified that she received her bachelor's degree in psychology, her master's degree in social work, and her doctorate degree in management administration. Dr. Coyne stated that her area of specialty is child welfare, bonding, and attachment. Dr. Coyne testified that she also has specific training, education, research, and professional experience in the ICWA, including being involved in the Child Welfare League of America, providing assistance in writing legislation regarding the ICWA, developing the Child Welfare Training Institute at UNO, giving prior testimony concerning the ICWA, providing assistance in training Indian workers on the regulations of the ICWA, and developing training sessions regarding the regulations of the ICWA. Dr. Coyne also testified that she has conducted over 22 years of research regarding child bonding and attachment.

Dr. Coyne admitted that she had not seen, interviewed, or evaluated Regina, Phoebe, or Rebekah and had not viewed any documentation related to the present case. Dr. Coyne then was asked to provide an opinion "as to a reasonable degree of sociological certainty" whether removal of children from a foster home would be harmful, based on a series of hypothetical questions concerning the facts of the present case. Regina's counsel objected, based on lack of foundation and improper opinion testimony; however, such objection was overruled. Dr. Coyne testified that if children had been with the same person over a long period of time and had developed an attachment to that person, separation from that person would produce great grief for the children. Dr. Coyne further opined that very young children who are separated from their foster parent after an attachment has been formed will suffer a "tremendous amount of grieving, crying, anger . . . for six to eight years subsequent to . . . the separation." Dr. Coyne also testified that the "hypothetical" children would be depressed, suffer disturbances in sleeping patterns, lack childhood development, and have emotional and behavioral problems. Dr. Coyne testified that children need permanency and consistency for bonding and attachment to take place and that if the "hypothetical" children were returned to their biological parent, it would be like returning them to a stranger. Dr. Coyne concluded her testimony by opining that Native American children would suffer the same consequences as stated above, just like any other child, because bonding and attachment cross all cultural lines.

## 2. REGINA'S EVIDENCE

Linda Brown, a family support specialist at Cedars, testified that she has been supervising Regina's visits with Phoebe, Rebekah, Hezekiah, and Josiah from February 1999 to the present. Brown testified that at the time of trial, Regina was still continuing supervised visits with Hezekiah and Josiah. Brown stated that Regina and Andrea visited with all four children on Mondays, Wednesdays, and Fridays for 2 hours a day and with only Phoebe on Thursdays, also for 2 hours. Brown testified that Regina and Andrea's visits with Phoebe and Rebekah stopped in October or November 2000. Brown stated that Regina was consistent in attending visits and was very happy to see her children. Brown

testified that the visits were a little chaotic at times because of the four children's differences in age. Brown testified that Regina was receptive to Brown's parenting suggestions. Brown stated that Rebekah would initiate and exchange affections with Regina, such as Rebekah's running up to Regina and hugging her at the beginning of a visit. Brown testified that Phoebe, because of her age, did not initiate that type of contact, but Regina would usually hug and initiate affection with both Phoebe and Rebekah. Brown testified that she did not see any type of behavior from the girls which indicated that they did not want to be at the visits.

Brown testified that she also helped Regina with her parenting skills; however, Brown also testified that she did not witness anything inappropriate about Regina's parenting. Brown stated that Regina was receptive to the parenting instructions and demonstrated knowledge and understanding of the lessons. On cross-examination, Brown testified that even if Regina were permitted to continue her visits with Phoebe and Rebekah, Brown opined that the visits should still be supervised because Regina and Andrea would forget certain parenting skills and safety concerns.

Suzanne Harris, a family support specialist at Cedars, testified that once a week, usually on Fridays, she assisted in Regina and Andrea's supervised visits with Hezekiah and Josiah. Harris stated that Regina had been consistent with her visits with Hezekiah and Josiah. Harris testified that she observed only one problem with Regina's parenting—she sometimes gets over-involved with playing video games on the Nintendo "Game Boy" or with Andrea's needs and loses focus of the children's needs. However, Harris testified that Regina's parenting has improved over time and that Regina is very interested in the boys' lives and their well-being. On cross-examination, Harris stated that Regina was very devoted to Andrea and that Harris did not believe Regina had any plans to divorce or separate from Andrea.

Dr. Henry Lee Balters, a psychologist, testified that through a request by DHHS, he conducted a psychological evaluation of Regina on July 31 and August 14, 2001. Dr. Balters testified that based on his evaluation, which included numerous psychological tests, one test indicated that Regina had no gross signs of depression, anxiety, disturbances in thought, social retreat, or

uncontrollability. Dr. Balters did state that Regina had a slight degree of depression and irritability, but not enough to cause any dysfunctionality in her lifestyle. Dr. Balters testified that another test showed that Regina has no deficiencies in terms of her cognitive capabilities, is able to understand her peers, has many intellectual strengths, and has average intelligence. Dr. Balters stated, however, that Regina has some slight lack of understanding as to what her own personal social obligations are. Dr. Balters testified that a third test showed that Regina had no serious dysfunction in terms of thought process, had a fear about losing her children and dying young, had a positive attitude about the future, and related better to women than to men. However, there were indications of some sadness and a dislike for pressure. After Dr. Balters' evaluation of the various tests, he opined to a reasonable degree of psychological certainty that Regina had a prolonged depressive reaction and relational problems, but nothing that would hinder her "parenting, per se." Dr. Balters did qualify his opinion by stating that he did not interview the girls or see Regina interact with the girls. Dr. Balters also opined that Regina had improved with the medication she was receiving from a Dr. Tatay, a psychiatrist; that Regina did not show any signs of intrusiveness, impulsiveness, or identity disturbance; and that he did not see any need for gross improvement before she was reunited with her children.

On cross-examination, Dr. Balters admitted that Regina's current mental health treatment and medication remedied many of her past issues. Dr. Balters also admitted that he was not making any kind of recommendation regarding termination, reunification, or best interests of Phoebe and Rebekah, because he had not seen the girls or Regina interact with them. Dr. Balters testified that Regina idolized Andrea and that Regina does not take the leadership role in the relationship.

Regina testified that she has a good relationship with Phoebe and Rebekah, that she has bonded emotionally with the two girls, and that the two girls have sought out physical contact from her, more so in Rebekah's case. Regina stated that she believes 100 percent that she is able to parent the two girls. Regina reiterated her previous testimony by stating that she would separate from Andrea in a "heartbeat" and choose her

girls' welfare over his if that was required of her to regain custody of her girls.

On cross-examination, Regina testified that when the children were removed from her home, she was not on medication. She also testified that she consistently takes her medication and believes that the medication enables her to parent more effectively. Regina stated that she is currently not in a therapy program and has completed the "P.A.C.T. program" but that she is seeing Dr. Tatay for medication and is still participating in supervised visits with Hezekiah and Josiah.

On July 15, 2002, the juvenile court of Lancaster County terminated Regina's parental rights to Rebekah, finding that the State proved beyond a reasonable doubt that (1) Rebekah had been in out-of-home placement for 15 or more months of the most recent 22 months, (2) active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of Regina's Indian family and those efforts proved unsuccessful, (3) continued custody by Regina was likely to result in serious emotional or physical damage to Rebekah, and (4) termination of Regina's parental rights to Rebekah was in Rebekah's best interests. On the same date, the juvenile court terminated Regina's parental rights to Phoebe, finding by clear and convincing evidence that Phoebe was a child within the meaning of § 43-247(3)(a) in that she lacked proper parental care by reason of the faults or habits of Regina and that the State proved beyond a reasonable doubt the same four allegations as listed in Rebekah's case.

Regina appeals, and both cases have been consolidated per order of this court.

### III. ASSIGNMENTS OF ERROR

Regina asserts, summarized and restated, that the juvenile court abused its discretion in (1) depriving her of her fundamental due process rights by proceeding with the termination of her parental rights to Phoebe, (2) finding that active efforts had been made to provide for remedial and rehabilitative services to prevent the breakup of the Indian family pursuant to § 43-1505(4), (3) concluding that there was evidence beyond a reasonable doubt that continued custody of Phoebe and Rebekah by Regina would

likely result in physical or emotional damage to the children pursuant to § 43-1505(6), and (4) finding by clear and convincing evidence that it was in Phoebe's and Rebekah's best interests to terminate Regina's parental rights to the girls.

## IV. STANDARD OF REVIEW

An order terminating parental rights pursuant to the Nebraska ICWA is reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. See, *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002); *In re Interest of Sabrienia B.*, 9 Neb. App. 888, 621 N.W.2d 836 (2001). However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001).

The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process presents a question of law. *In re Interest of Joseph L.*, 8 Neb. App. 539, 598 N.W.2d 464 (1999). In reviewing questions of law, an appellate court in proceedings under the Nebraska Juvenile Code reaches a conclusion independent of the lower court's ruling. *In re Interest of Tabatha R.*, 252 Neb. 687, 564 N.W.2d 598 (1997).

## V. ANALYSIS

### 1. Due Process

Regina first asserts that her procedural due process rights were violated because her parental rights to Phoebe were terminated solely on the grounds that Phoebe had been in out-of-home placement for 15 or more months of the most recent 22 months, pursuant to § 43-292(7). Regina's argument is very limited in scope and is quickly resolved. She claims that by basing the termination proceeding solely on the basis of § 43-292(7), she was denied the opportunity to contest in an adjudication hearing the original allegations of "mental illness" under § 43-292(5).

Regina points to no deficiencies in notice or in evidentiary standards as such—the typical challenges of due process. See, *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672

(2003) (no procedural notice and lack of adequate advisement of rights); *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992) (lack of right to confrontation and cross-examination). Her argument that the State denied her due process by eliminating mental illness as a ground for termination is without merit, because such was clearly to her benefit and did not prevent her from introducing positive evidence of her mental status.

■ At oral argument, Regina's counsel asserted that the due process denial stems from taking Phoebe from Regina on mental illness grounds and then dismissing such allegation when the burden of proof increased from a "probable cause" determination to "beyond a reasonable doubt." In addition to being moot, since we cannot "undo" the temporary detention order keeping Phoebe's custody with DHHS pending the adjudication hearing, the answer lies in an appeal from the detention order. See *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997) (detention order issued after hearing and which continues to withhold custody of juvenile from parent pending adjudication hearing is final, appealable order). Thus, we conclude that Regina was afforded due process, and this assignment of error is without merit.

### 2. Active Efforts to Provide Remedial and Rehabilitative Services Pursuant to § 43-1505(4)

Regina next asserts that the juvenile court erred in finding that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of Regina's Indian family, which efforts proved unsuccessful.

■ The federal ICWA was enacted to promote the stability and security of Indian tribes and families through the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. *In re Interest of C.W. et al., supra.* Congress had two main goals when it enacted the federal ICWA: (1) to protect the best interests of the Indian children and (2) to promote the stability and security of Indian tribes and families. See *id.* The ICWA is based on the assumption that protection of the Indian child's relationship to the tribe is in the child's best interests. *Id.*

■ The state's counterpart, the Nebraska ICWA, sets forth guidelines to govern courts in any involuntary proceeding in a state court when the court knows or has reason to know that an Indian child is involved. See § 43-1505. Section 43-1505(4), addressing termination of parental rights in cases involving an Indian child, provides as follows:

> Any party seeking to effect . . . termination of parental rights to . . . an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

In the present case, Bennett, who was the primary DHHS caseworker for Regina's family, testified that he arranged for therapeutic providers and parenting classes for Regina and Andrea; personally supervised the visitation with the four children; provided for transportation, specifically bus passes and cab vouchers; arranged evaluations for the family; arranged for foster homes for the children; kept in regular contact with Regina, Andrea, Dorothy, and the children; provided medical coverage for the children; and prepared case plans and court reports. Based on Bennett's testimony and the supporting record, the juvenile court did not err in finding that reasonable efforts had been made to provide for remedial services and rehabilitative programs designed to prevent the breakup of Regina's Indian family.

### 3. SERIOUS EMOTIONAL OR PHYSICAL DAMAGE TO CHILDREN PURSUANT TO § 43-1505(6)

Regina next asserts that the juvenile court erred in finding that Dr. Coyne was an expert and in finding that there was evidence beyond a reasonable doubt that the continued custody of Phoebe and Rebekah by Regina was likely to result in serious emotional or physical damage to the girls.

■ Pursuant to the ICWA, qualified expert testimony is required in a parental rights termination case on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home. *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992). The Bureau of Indian

Affairs sets forth guidelines under which expert witnesses most likely will meet the requirements of the ICWA:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and child-rearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty."

239 Neb. at 824, 479 N.W.2d at 111.

In the present case, Dr. Coyne's testimony reveals that she has substantial education and experience in the area of child welfare, bonding, and attachment and in the sociological aspects of childhood. She is experienced and knowledgeable about the ICWA. Whether a witness is qualified to testify as an expert under the Nebraska Evidence Rules, which serve as a guidepost in termination of parental rights cases, is a preliminary question of admissibility for a trial court under Neb. Evid. R. 104(1), Neb. Rev. Stat. § 27-104(1) (Reissue 1995). *In re Interest of Brettany M. et al., ante* p. 104, 644 N.W.2d 574 (2002). Such a determination will be upheld on appeal unless the trial court's finding is clearly erroneous. *Id.* Based on the evidence noted above concerning Dr. Coyne's qualifications, the juvenile court's determination that her opinion concerning bonding and attachment was admissible was not clearly erroneous. See *In re Interest of C.W. et al., supra* (holding that licensed psychologist with extensive clinical research experience with children was qualified as expert for ICWA purposes).

■ Under the ICWA, a determination to terminate parental rights must be "supported by evidence beyond a reasonable doubt." § 43-1505(6). Proof beyond a reasonable doubt is proof so convincing that one would rely and act upon it without hesitation in the more serious and important transactions of life. NJI2d Crim. 2.0.

In *In re Interest of C.W. et al., supra*, the sole Nebraska case regarding the "beyond a reasonable doubt" standard in ICWA termination cases, the State brought a petition against a mother of four Indian children for termination of her parental rights in the separate juvenile court of Lancaster County on the grounds of abandonment, neglect, and her habitual use of intoxicating liquor and narcotics. The juvenile court terminated the mother's parental rights, stating that she was unfit by reason of abuse of intoxicating liquor and drugs and that reasonable efforts to correct the problems had failed. The mother appealed, assigning numerous assignments of error, including that the State did not provide a qualified expert as required by the ICWA. The Nebraska Supreme Court first held that a licensed psychologist was a qualified expert, even though he lacked experience with the Indian way of life. The Supreme Court then found that the reasonable doubt standard had been satisfied, citing the extensive evidence on the mother's addictions, her denial thereof, her mental health commitments, and the fact that she had served over 900 days in jail for offenses related to her alcohol and inhalant addictions.

The Supreme Court then pointed out that the licensed psychologist said that the children would likely suffer serious emotional harm if returned to their mother. The court concluded:

> The evidence supports a causal relationship between the mother's behavior and likely damage to the children, and we will not ask the children to wait and see whether their mother grows up in the future. She has not found the incentive to mature and change her lifestyle over the years this case has been progressing through the juvenile court, when that was the only obstruction to having her children returned to her.

*In re Interest of C.W. et al.*, 239 Neb. 817, 831, 479 N.W.2d 105, 115 (1992).

*In re Interest of Teela H.*, 4 Neb. App. 608, 547 N.W.2d 512 (1996), a non-ICWA case, contains an extensive discussion of attachment, bonding, and the fallaciousness of using the child's attachment to a foster parent as a ground to deny reunification. The observations there would seem to apply with even greater force to parental rights termination, when the only real evidence to support termination is that separation from the foster mother

will cause great emotional harm to the child because the child and foster mother are bonded. In *In re Interest of Teela H.*, the 4-year-old child, Teela, had been in long-term foster care for approximately 80 percent of her life. Teela's biological mother sought reunification or to establish visitation. Our observations in *In re Interest of Teela H.* are equally if not more applicable in a case where termination is the issue.

We are troubled by the fact that the principal obstacle to reunification appears to be that Teela suffers psychological distress when she perceives the potential of being separated from her foster parents. If there is ever to be reunification between [the biological mother] and Teela, it is likely that Teela will suffer emotional distress . . . at least to some extent, from the process of leaving her foster parents. Yet, to use the occurrence of such distress as justification for denying reunification means that reunification of parent and child through and after rehabilitation of parental shortcomings becomes illusory. . . . [I]t would seem that inherent in the institutionalization of foster care is acceptance of at least some degree of emotional upset and trauma when formerly neglected or abused children are removed from loving and caring foster parents and returned to their natural parent or parents. We do not see how it could be otherwise. Typically, the point of discussion will center on "bonding," e.g., the child is bonded with the foster parent or parents, but not so with the natural parent. But using the bonding theory when applying the "best interests" standard should not be camouflage for an insidious "best resources" test.

Some courts have expressed concern over harsh results to parents of few resources if child placement decisions are based solely on the need for continuity in care. See *Matter of Guardianship of K.L.F.*, 129 N.J. 32, 45, 608 A.2d 1327, 1333 (1992) (observing that "facile use of the bonding theory can increase the risk of institutional bias militating in the direction of permanent placement and adoption of children in foster care"). . . .

"Moreover, there are the grave pitfalls that may be encountered in the application of otherwise sound psychological parenting and bonding theories. Scholars and some

courts suggest that theories of parental bonding may be relied on too often to keep children in foster care rather than return them to their parents. *E.g., In re Interest of L.J.,* 220 Neb. 102, 368 N.W.2d 474, 483 (1985)." [*Matter of Guardianship of J.C.,*] 129 N.J. [1,] 20, 608 A.2d [1312,] 1321 [(1992)].

The Nebraska case cited by the New Jersey Supreme Court contains the following language: "For the State to now argue that the children have now become so 'bonded' to their foster parents as to require termination of parental rights in this case is to defy legal logic. By separating a parent from that parent's children for extraordinary lengths of time, the State could justify termination of any parental rights. This cannot be, and is not, the law.

"We have said that a child must not be made to await uncertain parental maturity. *In re Interest of M.S.,* 218 Neb. 889, 360 N.W.2d 478 (1984). That rule is sound. However, the rule should not be used to trod upon the rights of the parent or the children." *In re Interest of L.J., J[.]J., and J.N.J.,* 220 Neb. 102, 115, 368 N.W.2d 474, 483 (1985).

We suggest that a legal system which allows removal of a neglected or abused child from its parent, placement in foster care during parental rehabilitation, and then removal from foster care and return to the natural parent has, of necessity, opted for the resilient "child psyche" concept. Therefore, in the instant case, that Teela has manifested separation anxiety, by itself, seems patently insufficient to deny reunification—to conclude otherwise would be to make rehabilitation and reunification a sham.

(Emphasis omitted.) *In re Interest of Teela H.,* 4 Neb. App. 608, 618-20, 547 N.W.2d 512, 519-20 (1996).

Dr. Coyne admitted that she did not interview or evaluate Regina, Andrea, or the girls. However, based on a series of hypothetical questions, Dr. Coyne opined that because of the girls' attachment to Dorothy, they would suffer serious emotional and physical damage if returned to Regina. But as we suggested in *In re Interest of Teela H., supra,* separation anxiety and distress from a foster parent seem patently insufficient to deny reunification. And the instant case requires stronger proof than in *In re Interest*

*of Teela H.* because not only is this a termination case, the standard of proof is beyond a reasonable doubt under the ICWA.

After our de novo review, we find that there is ample testimony that Regina has improved her life, her housing situation, her emotional and mental status, her employment, and her parenting skills. We can reach no other conclusion except that her efforts to be a mother to her children have been genuine, sustained, and productive. Unlike in *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992), there is no evidence of abandonment, physical abuse, alcohol or narcotic use, or imprisonment. Lastly, Regina consistently participated in the supervised visits with her girls before visitation was suspended. The supervised visits were suspended only because according to Dorothy, the girls were manifesting negative behaviors which no one else reported or observed and which Dr. Stormberg used as a basis for recommending that visitations be ended—although she also said the girls seemed comfortable around Regina.

For these reasons, we find that the State has failed to prove beyond a reasonable doubt that if Regina were to gain custody of the girls at some point in the future, serious emotional or physical damage to the girls would result. In *State, Dept. of Health v. M.L.L.*, 61 P.3d 438 (Alaska 2002), the Alaska Supreme Court held that even though an Indian mother abused alcohol in the past, was diagnosed with mental illness, demonstrated an inability to cope with stress, had limited intelligence, demonstrated poor decisionmaking ability, and generally lacked basic parenting skills, and even though the evidence reflected that the Indian children would suffer serious emotional damage if the bond with their foster parents of 4 years were broken, the State of Alaska failed to prove beyond a reasonable doubt that returning the children to their biological mother would likely cause them severe emotional harm. This record shows that Regina is a far, far better mother than the mother in the Alaska case. Given that the reasonable doubt standard is very high, we conclude that in the instant case, the State's evidence fails to carry its burden of proof.

### 4. Best Interests Pursuant to § 43-292

■ Lastly, Regina asserts that the juvenile court erred in finding that it was in Phoebe's and Rebekah's best interests to

terminate Regina's parental rights to the girls. Given our finding above, we need not address this issue because our basis for the reversal of the trial court has been detailed. This is not to suggest that Regina should have immediate custody, but that reasonable efforts to reunify Phoebe and Rebekah with Regina should be the focus. See *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999) (best interests of children are primary consideration in any question concerning termination of parental rights).

## VI. CONCLUSION

We reverse the decision of the juvenile court terminating Regina's parental rights to Phoebe and Rebekah, and remand the matter for further proceedings by the juvenile court consistent with our opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.