IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF EYLLAN J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF EYLLAN J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
NATHANIEL V., APPELLANT.

Filed October 21, 2014.    No. A-14-300.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Leonard G. Tabor for appellant.

No appearance for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Nathaniel V. appeals from an order of the Scotts Bluff County Court, sitting as a juvenile court, which terminated his parental rights to his son, Eyllan J., in a case in which the Nebraska Indian Child Welfare Act (NICWA) is applicable. Upon our de novo review, we find that a statutory ground to terminate exists, that the additional requirements under NICWA were met, and that termination is in Eyllan's best interests. Accordingly, we affirm the county court's order terminating Nathaniel's parental rights.

## II. BACKGROUND

Nathaniel is the biological father of Eyllan, born in January 2013. Eyllan's biological mother, Elizabeth J., relinquished her parental rights during the pendency of the lower court

- 1 -

proceedings. As a result, she is not a party to this appeal and her involvement in the county court case, and in Eyllan's life, will be discussed only to the extent necessary to provide context.

On January 24, 2013, shortly after Eyllan's birth, the State filed a petition alleging that he came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) in that he lacked proper parental care by reason of the faults or habits of both Nathaniel and Elizabeth. Specifically, the petition alleged, in part, that both Nathaniel and Elizabeth have a history of using methamphetamine; that Nathaniel was currently incarcerated for a conviction of possession of methamphetamine and was, as a result, unable to care for Eyllan; and that Elizabeth admitted that she ingested methamphetamine at least five times while she was pregnant with Eyllan, including 5 days before his birth. The petition also alleged that Eyllan "is of Native American heritage and subject to the provisions of [NICWA]."

At the same time that the petition was filed, Eyllan was removed from his parents' care and placed in a foster home. In fact, it appears that Eyllan was actually removed from the hospital before Elizabeth had a chance to take him home after his birth. Because Eyllan has remained in an out-of-home placement since his removal in January 2013, he has never resided with either of his parents.

In April 2013, Eyllan was adjudicated and determined to be a juvenile within the meaning of § 43-247(3)(a) based on Elizabeth's admissions to the allegations in the State's petition. It is not clear from our record whether Eyllan was ever adjudicated to be within the meaning of § 43-247(3)(a) as to Nathaniel. However, our record does reveal that regardless of whether there was an actual adjudication order, Nathaniel was provided with a rehabilitation plan by the Department of Health and Human Services (the Department) to assist him in regaining reunification with Eyllan. The rehabilitation plan required Nathaniel to do the following: work with a family support worker on improving his parenting skills and obtaining appropriate housing; submit to a substance abuse evaluation and follow the recommendations that resulted from such an evaluation; participate in monthly team meetings; attend regular, supervised visitation with Eyllan; participate in regular drug testing; and be a law-abiding citizen.

On December 19, 2013, 1 month prior to Eyllan's first birthday, the State filed a motion to terminate Nathaniel's parental rights. In the motion, the State alleged that termination of Nathaniel's parental rights was warranted pursuant to Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012), because he had abandoned Eyllan for at least the preceding 6 months; § 43-292(2), because he had substantially and continuously or repeatedly neglected and refused to give Eyllan necessary parental care and protection; § 43-292(4), because he is unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which is found by the court to be seriously detrimental to the health, morals, or well-being of Eyllan; and § 43-292(6), because reasonable efforts to preserve and reunify the family failed to correct the conditions that led to the determination that Eyllan was within the meaning of § 43-247(3)(a). The State's motion also alleged that termination of Nathaniel's parental rights was in Eyllan's best interests; that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful; and that continued custody by Nathaniel was likely to result in serious emotional or physical damage to Eyllan.

On March 10, 2014, a hearing was held on the State's motion to terminate Nathaniel's parental rights. While we have carefully reviewed the evidence presented at the hearing in its entirety, we do not set forth the specifics of the testimony and exhibits here. Rather, we will set forth specific facts as presented at the hearing as necessary in our analysis below. We do note that the evidence presented at the hearing revealed that Nathaniel was incarcerated on various drug charges for a majority of the time the county court proceedings were pending.

After the termination hearing, the county court entered an order finding that the State proved by clear and convincing evidence that grounds for termination of Nathaniel's parental rights existed pursuant to § 43-292(2), (4), and (6) and that termination was in Eyllan's best interests. The court also specifically found that the State had presented the testimony of "a qualified expert witness for the purpose of [N]ICWA cases" and that based on that testimony, there was sufficient evidence to support a finding that returning Eyllan to Nathaniel's care would result in serious emotional or physical damage. Finally, the court found that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family prior to the termination of parental rights, but that those efforts had failed. Based on these findings, the court entered an order terminating Nathaniel's parental rights to Eyllan.

Nathaniel appeals from the county court's order here.

### III. ASSIGNMENTS OF ERROR

On appeal, Nathaniel assigns as error and argues four issues, which we rephrase and consolidate into three issues for our review. First, he alleges that the county court erred in finding that termination of his parental rights was warranted pursuant to § 43-292(2). Second, he alleges that the court erred in determining that the State's expert witness was a "qualified expert witness," who could provide an opinion about whether continued custody of Eyllan by Nathaniel would result in serious emotional and physical damage to him, pursuant to NICWA. Third, Nathaniel alleges that the court erred in finding that termination of his parental rights was in Eyllan's best interests.

### IV. STANDARD OF REVIEW

An order terminating parental rights pursuant to NICWA is reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. See, *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002); *In re Interest of Sabrienia B.*, 9 Neb. App. 888, 621 N.W.2d 836 (2001). However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001).

### V. ANALYSIS

On appeal, each of Nathaniel's assigned errors generally challenges the county court's decision to terminate his parental rights to Eyllan. Before we address Nathaniel's specific assertions, however, we must outline the relevant law pertinent to the termination of parental rights in a case in which NICWA is applicable.

The Nebraska Supreme Court has held the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. See *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id*.

NICWA, Neb. Rev. Stat. §§ 43-1501 to 43-1516 (Reissue 2008 & Cum. Supp. 2013), however, adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). First, § 43-1505(4) provides an "active efforts" element:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

We note that, on appeal, Nathaniel does not challenge the county court's finding that active efforts were made to prevent the breakup of his family. As such, we will not specifically address this issue any further in this opinion.

The second additional element required by NICWA can be found in § 43-1505(6). That section provides a "serious emotional or physical damage" element:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

See, also, *In re Interest of Phoebe S.*, 11 Neb. App. 919, 664 N.W.2d 470 (2003) (under NICWA, determination to terminate parental rights must be supported by evidence beyond reasonable doubt).

We now turn to Nathaniel's specific assertions of error.

### 1. STATUTORY FACTORS

In the county court's order, it found that termination of Nathaniel's parental rights was warranted pursuant to § 43-292(2), (4), and (6). In his brief to this court, Nathaniel assigns as error only the court's finding that termination was warranted pursuant to § 43-292(2). However, in the argument section of his brief, Nathaniel appears to address the county court's findings as to each of the three statutory factors warranting termination of his parental rights. As we have often stated, though, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. See *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). Accordingly, we do not address Nathaniel's assertions with regard to § 43-292(4) or (6). Instead, we focus our analysis on whether the evidence presented at the termination hearing sufficiently demonstrated that Nathaniel has substantially and continuously or repeatedly neglected Eyllan and refused to give him necessary parental care and protection, pursuant to § 43-292(2).

The evidence presented at the termination hearing revealed that for a majority of the time this case was pending in the county court, Nathaniel failed to provide Eyllan with any parental

care or protection because he was incarcerated and unable to have any contact with Eyllan. In fact, Nathaniel has been out of jail for only 2 months of Eyllan's life.

Nathaniel has a history of drug use which has resulted in him spending the majority of the last 3 years incarcerated. This history began before Eyllan's birth, in 2011, when Nathaniel was found guilty of possession of methamphetamine and carrying a concealed weapon. He was sentenced to a total of 1 year in jail for his convictions. According to Nathaniel's estimations, after he was released from jail, he was sober approximately 5 months before he began using methamphetamine again and was subsequently arrested.

Nathaniel's next conviction for possession of methamphetamine occurred in the fall of 2012. This conviction resulted in another sentence of 1 year in jail. As a result of this conviction and sentence, Nathaniel remained incarcerated at the time of Eyllan's birth in January 2013. Nathaniel was released from jail in April 2013, when Eyllan was approximately 3 months old. At this time, Nathaniel began to cooperate with the Department and began to have visits with Eyllan. However, by the beginning of May, Nathaniel began missing visitations with Eyllan and admitted to the Department workers that he was using methamphetamine again.

In June 2012, less than 2 months after he had been released from jail, Nathaniel was arrested and charged with possession of methamphetamine. Nathaniel pled no contest to the charge and was sentenced to a term of 1 to 2 years in prison. Nathaniel remained incarcerated on this charge until March 2014. He testified at the termination hearing that he had been released from prison approximately 1 week before and that he was currently on parole.

Nathaniel's history of drug use and the resulting periods of incarceration as a result of this drug use are troubling, and appear to represent a pattern of behavior indicative of Nathaniel's inability to remain sober when he is not in jail. However, what is perhaps the most troubling is Nathaniel's most recent arrest and conviction. This arrest occurred after Eyllan's birth and after Eyllan had been removed from his mother's care and placed in the custody of the Department. As such, this arrest is particularly telling regarding Nathaniel's ability to place Eyllan's needs before his own needs and before his addiction. Ultimately, this arrest reveals that Nathaniel chose to engage in inappropriate and illegal behavior even after he knew of the severe consequences such behavior would have on his relationship with Eyllan.

As a result of Nathaniel's repeated incarcerations, he has been unable to provide Eyllan with such basic necessities as housing and food. He has not been able to tend to Eyllan's basic needs or provide any emotional support. In fact, Nathaniel has seen Eyllan only a handful of times in between his periods of incarceration. The Nebraska Supreme Court has recognized that in termination of parental rights cases, it is proper to consider a parent's inability to perform his or her parental obligations because of imprisonment. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). A parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. *Id.*

Given the evidence presented, it is clear that Nathaniel has failed to provide Eyllan with any parental care or protection throughout the entire duration of these proceedings. He has neglected Eyllan's physical, emotional, and financial needs, and has not put himself in a position to have seen Eyllan since May 2013. Accordingly, upon our de novo review of the record, we conclude that the county court did not err in concluding that termination of Nathaniel's parental rights to Eyllan was warranted pursuant to § 43-292(2).

## 2. QUALIFIED EXPERT WITNESS UNDER NICWA

As we explained in more detail above, in order to terminate parental rights in a case in which NICWA is applicable, the State must prove, beyond a reasonable doubt, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. See § 43-1505(6). Proof of this element requires the testimony of a "qualified expert witness." *Id.*

In the county court's order, it found that the State had presented the testimony of "a qualified expert witness for the purpose of [N]ICWA cases," Megan Patterson, and that based on Patterson's testimony, there was sufficient evidence to support a finding that returning Eyllan to Nathaniel's care would result in serious emotional or physical damage. On appeal, Nathaniel challenges the court's finding. Specifically, he argues that Patterson was not a "qualified expert witness" pursuant to the NICWA guidelines and that there was not sufficient evidence to support a finding of serious emotional or physical damage. Upon our review of the record, we affirm the findings of the county court.

Pursuant to NICWA, qualified expert testimony is required on the issue of whether serious emotional or physical damage to the Indian child is likely to occur if termination of parental rights is not ordered. See § 43-1505(6). The Nebraska Supreme Court has previously addressed the qualifications of experts to give testimony under § 43-1505. In *In re Interest of C.W. et al.*, 239 Neb. 817, 824, 479 N.W.2d 105, 111 (1992), *overruled on other grounds, In re Interest of Zylena R.*, 284 Neb. 834, 825 N.W.2d 173 (2012), the court noted the following guidelines set forth by the Bureau of Indian Affairs under which expert witnesses will most likely meet the requirements of NICWA:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices with the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty."

In this case, the State called Patterson to testify that returning Eyllan to Nathaniel's care was likely to result in serious emotional or physical damage to him. Patterson is currently employed as a school psychologist. Her educational background includes an education specialist degree and a bachelor's degree in social work. Previous to her current employment position, she has worked as a social worker who specialized in and worked exclusively with Native American families. As a part of this employment, she provided expert testimony in NICWA cases, developed activities for children living outside of their tribe to maintain "cultural connectiveness," and worked with tribes to facilitate enrollment of Indian children. In addition, Patterson has experience providing parental supervision, parenting education, and in-home counseling for Native American families. Patterson testified that she continues to have knowledge of "the prevailing social and cultural standard for rearing children within the Native

American community." She also indicated that she has experience with the Sioux Tribe, which is the tribe in which Eyllan is eligible for enrollment.

Given her extensive background and continued involvement with Native American families, and the Sioux Tribe in particular, we find that the record establishes that Patterson was sufficiently qualified to testify as an expert witness under the requirements of NICWA. The evidence supports a determination that Patterson has extensive knowledge of social and cultural standards in childrearing practices within Native American communities, including the Sioux Tribe, and also that she has experience in child and family services with Native American families. Accordingly, the county court did not err by finding that Patterson was qualified to render expert testimony pursuant to NICWA. Nathaniel's assertion to the contrary is without merit.

We next turn to Nathaniel's assertion that even if Patterson was a qualified expert witness under NICWA, that her testimony did not sufficiently establish that if Nathaniel were to regain custody of Eyllan, it would likely result in serious emotional or physical damage to Eyllan. Nathaniel's arguments on this subject focus on Patterson's failure to interview or observe either Eyllan or Nathaniel.

Upon our review, we conclude that Nathaniel's assertion is without merit. Patterson's testimony established that she had sufficient foundation to render an opinion about Eyllan's well-being. Moreover, there was sufficient evidence in the record to demonstrate beyond a reasonable doubt that if Nathaniel were to regain custody of Eyllan, it would likely result in serious emotional or physical damage to Eyllan.

At the termination hearing, Patterson testified that it was her opinion that Nathaniel's having continued custody of Eyllan "would result in serious physical damage or trauma because of [Nathaniel's] extensive history with drugs and the resulting . . . incarcerations." She went on to explain that Nathaniel has been unable to maintain his sobriety when he has not been incarcerated and, as a result, has been unable to make himself available to be a parent to Eyllan. In particular, Patterson pointed to Nathaniel's most recent incarceration as evidence of his inability to stay away from drugs for the benefit of Eyllan.

Patterson also testified that she had based her opinions on her review of Eyllan's "case file." This file included court records and journal entries, case plans and reports from the Department, reports from various service providers who had met with Nathaniel and/or Eyllan during the pendency of the case, and information from the Nebraska Department of Correctional Services regarding Nathaniel's history of incarcerations.

During cross-examination, Patterson admitted that her review of this case and of Eyllan's circumstances had not included a meeting with either Nathaniel or Eyllan, nor had it included any personal observations of Nathaniel and Eyllan interacting with each other. While we recognize that the absence of such personal interactions with the family could be viewed as a limitation to Patterson's ultimate opinions about Eyllan's future needs, we also must recognize the realities of this case. Nathaniel was incarcerated throughout the pendency of the lower court proceedings. As a result, he was not readily available to be interviewed by Patterson, nor was he having any contact with Eyllan that Patterson could observe. In addition, at the time of the termination hearing, Eyllan was only 1 year old. Due to his young age, it is not clear that any

direct observation or conversation with him would have added much, if anything, to Patterson's knowledge about the family's circumstances.

Moreover, other evidence presented at the termination hearing supported Patterson's opinion about the potential for serious emotional or physical damage. This evidence demonstrated that Nathaniel has a history of drug use that has resulted in him being incarcerated for the better part of the last 3 years. Nathaniel has shown himself to be incapable of staying sober while out in the community, even after Eyllan's birth and placement in a foster home. As a result of Nathaniel's drug use and incarcerations, he has been unable to be a parent to Eyllan. He has never provided Eyllan with any substantial physical, emotional, or financial support and he has not even seen Eyllan since May 2013. Eyllan does not know Nathaniel and does not have any sort of bond to him.

Based on the totality of the evidence presented at the termination hearing, it is clear beyond a reasonable doubt that custody of Eyllan by Nathaniel is likely to result in serious emotional or physical harm to Eyllan. Nathaniel has exhibited a serious addiction to drugs and has, at this point, been unable to demonstrate that he has gotten his addiction under control or that he is capable of being a parent to Eyllan. Such evidence is sufficient to support the county court's finding concerning the potential for serious emotional or physical harm.

### 3. BEST INTERESTS

In its order, the county court also found that termination of Nathaniel's parental rights was in Eyllan's best interests. Nathaniel challenges this finding. Specifically, Nathaniel argues that he has made progress toward achieving reunification with Eyllan and that he should be given another opportunity to prove that he can be an appropriate parent. In addition, he argues that the court should not have admitted into evidence the testimony of the Department caseworker for the family, David Fox, that termination was in Eyllan's best interests. Upon our de novo review of the record, we find sufficient evidence to conclude that termination of Nathaniel's parental rights was in Eyllan's best interests. We affirm.

At the termination hearing, Nathaniel testified that he had been released from prison 1 week ago and that he was currently on parole for the next 2 months. He also testified that while he was incarcerated, he attended and completed an intensive outpatient treatment program for substance abuse, obtained his high school diploma through the GED program, and attended a parenting class. He also testified that he was willing to attend counseling and that he wanted to attend college. Nathaniel told the court that he was ready to be a more appropriate parent for Eyllan:

> I have changed and . . . I have learned from where I just came from, from all my classes and all that. I think that I can be a better parent, considering the fact that the first chance I had, I didn't have any kind of treatment or I didn't have any GED. I didn't have anything like that. So this time around I think I'll be suitable.

We first note that we applaud Nathaniel's efforts to enroll in and complete a drug treatment program and a parenting class. However, when we consider Nathaniel's efforts during his latest incarceration alongside his history of recurring drug use and alongside his efforts throughout the duration of the lower court proceedings, we conclude that Nathaniel has simply not made significant progress toward reunification with Eyllan.

Nathaniel's efforts to complete the drug treatment program while incarcerated are only the first steps in becoming a sober and stable parent. The discharge summary from his treatment facility indicated that Nathaniel's prognosis is "fair but guarded due to multiple relapses and returning to the same area." In addition, the discharge summary indicated that Nathaniel needed to continue his treatment after his release from prison and from parole. We also note that during his testimony, Nathaniel admitted that he had to attend substance abuse treatment in order to be placed on parole. Accordingly, his motivation for attending the treatment and his desire to actually live a sober lifestyle is not entirely clear.

In short, it is clear that Nathaniel still has a lot of work to do in order to remain drug free. Remaining drug free outside of prison is arguably very different than remaining drug free while incarcerated. Due to Nathaniel's history of drug use outside of the prison walls, he would have to demonstrate his ability to sustain his sobriety for a period of time prior to achieving any kind of reunification with Eyllan.

Moreover, Nathaniel indicated that after his release from prison, he must reside in transitional housing. After that, he planned on residing in his mother's apartment. This housing may present some challenges to Nathaniel, as he will be returning to the same environment where he has readily obtained and used drugs. Nathaniel does not have employment, and although he expressed an interest in obtaining either a job or a college education, he has not taken any significant steps toward either goal.

Nathaniel admitted that he does not have a bond with Eyllan. In fact, he testified that Eyllan does not even know him. Nathaniel has not been any part of Eyllan's life for almost a year, and prior to that, Nathaniel saw Eyllan only a handful of times when Eyllan was 3 months old.

The Department caseworker for the family, Fox, testified that it was his opinion that termination of Nathaniel's parental rights would be in Eyllan's best interests because of the length of time that Eyllan has been in foster care and because of Nathaniel's absence from Eyllan's life. Although Nathaniel asserts that the county court should not have admitted this opinion at the hearing, we conclude that there was sufficient foundation to support Fox's opinion. Fox had been the family's caseworker for almost 1 year, and he had a great deal of knowledge about the family's circumstances and about Eyllan's needs. Accordingly, in our de novo review of the evidence, we consider Fox's testimony and his opinion about best interests. We agree with his statements.

The evidence presented at the termination hearing revealed that despite Nathaniel's desire to be reunited with Eyllan, he is simply not ready or able to be an effective parent. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.*

By the time of the termination hearing in March 2014, Eyllan had been in an out-of-home placement for 14 months, which was his entire life. Eyllan deserves a permanent and stable home environment, which Nathaniel is unable to provide. We conclude that termination of Nathaniel's parental rights is in Eyllan's best interests. We affirm the order of the county court.

## VI. CONCLUSION

We conclude that the county court did not err in finding that Nathaniel's parental rights to Eyllan should be terminated pursuant to § 43-292(2). Regarding the requirements of NICWA, the county court did not err in finding that Nathaniel's continued custody of Eyllan would likely result in serious emotional or physical damage, pursuant to § 43-1505(6). Finally, the county court did not err in finding that termination of Nathaniel's parental rights was in Eyllan's best interests. Therefore, the county court's order terminating Nathaniel's parental rights to Eyllan is affirmed.

AFFIRMED.